**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE HERTZ CORPORATION,<br><br>                    Plaintiff,<br><br>v.<br><br>ACCENTURE LLP,<br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 19-3508-WHP

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

1.      The Hertz Corporation ("Hertz" or the "Plaintiff") is one of the world's largest and most familiar vehicle rental companies.  In early 2016, Hertz began an ambitious project to transform its digital identity.  The primary objective of the project is to redefine the customer experience on Hertz's digital platforms, by developing a market-leading website at Hertz.com and a complementary suite of mobile applications, all based on a platform that Hertz could readily extend to its other rental brands, including Dollar and Thrifty.

2.      Hertz spent months planning the project.  It assessed the current state of its e-commerce activities, defined the goals and strategy for its digital business, and developed a roadmap that would allow Hertz to realize its vision.

3.      Hertz did not have the internal expertise or resources to execute such a massive undertaking; it needed to partner with a world-class technology services firm.  After considering proposals from several top-tier candidates, Hertz narrowed the field of vendors to Accenture and one other.

4.      After Accenture put on an impressive, one-day presentation for the Hertz team that included a demonstration of the transformed Hertz digital experience, Hertz selected

Accenture to design, build, test, and deploy Hertz's new website and mobile applications (or "apps").

5.       Because of Hertz's work with Accenture in the initial planning phases, Hertz trusted Accenture to lead the project and deliver website and apps that met Hertz's business requirements.

6.       Hertz relied on Accenture's claimed expertise in implementing such a digital transformation.  Accenture served as the overall project manager.  Accenture gathered Hertz's requirements and then developed a design to implement those requirements.  Accenture served as the product owner, and Accenture, not Hertz, decided whether the design met Hertz's requirements.

7.       Accenture committed to delivering an updated, redesigned, and re-engineered website and mobile apps that were ready to "go-live" by December 2017.

8.       Accenture began working on the execution phase of the project in August 2016 and it continued to work until its services were terminated in May 2018.  During that time, Hertz paid Accenture more than $32 million in fees and expenses.  Accenture never delivered a functional website or mobile app.  Because Accenture failed to properly manage and perform the services, the go-live date was postponed twice, first until January 2018, and then until April 2018.  By that point, Hertz no longer had any confidence that Accenture was capable of completing the project, and Hertz terminated Accenture.

9.       In fact, Accenture's work was seriously deficient in multiple respects.

10.       For instance, the contract documents required Accenture to develop a responsive website – one that automatically scales content and elements to match the screen size of the device on which the website is viewed – with breakpoints for small (phone), medium (tablet),

and large (desktop) displays.  Accenture ignored the specification that called for a medium-sized layout and developed the website for only small and large breakpoints, and demanded hundreds of thousands of dollars in additional fees to deliver the promised medium-sized layout.

11.    As another example, the Architecture Specifications for the Project expressly specified that a fundamental principle of the design of the website was its *extensibility* – that is, the use of a common core of libraries that could be extended across the websites and mobile apps for each of Hertz's brands.  Without Hertz's knowledge or approval, Accenture deliberately disregarded the extensibility requirement and wrote the code so that it was specific to the Hertz brand in North America and could not be used for the Hertz global brand or for the Dollar and Thrifty brands.

12.    The quality of Accenture's programming was deficient as well.  Accenture's developers wrote the code for the customer-facing ecommerce website (the "front-end development" or "FED" code) in a way that created serious security vulnerabilities and performance problems.  The defects in the FED code were so pervasive that all of Accenture's work on that component had to be scrapped.  For other components of the system, substantial portions of the code were also unusable.

13.    In addition, Accenture failed to perform proper testing of the software that it developed.  Accenture did not perform tests on many components of the system.  When Accenture did perform tests, they were seriously inadequate, to the point of being misleading.

14.    Despite having received tens of millions of dollars in fees, Accenture never delivered a usable website or mobile apps.  To the contrary, simply completing the project – which required identifying and remediating the defects in Accenture's work and the development of functionality that Accenture was supposed to deliver but could not – required Hertz to expend

more than $10 million in additional fees.  Worse, Accenture's failure to timely deliver the website and apps for which it was so generously paid has caused Hertz to lose millions of dollars in revenue in a tremendously competitive industry.

15.     Hertz now brings this action to recover the fees that it paid to Accenture and the damages that it has suffered and continues to suffer as a result of Accenture's breaches.

## THE PARTIES

16.     Hertz Corporation is incorporated under the laws of Delaware with a principal place of business at 8501 Williams Road, Estero, FL 33928.

17.     Upon information and belief, defendant Accenture LLP is an Illinois partnership with a principal place of business at 161 North Clark Street, Chicago, Illinois 60601.

## NATURE OF THE ACTION

18.     This is an action for breach of contract, specifically the Consulting Services Agreement by and between Hertz Corporation and Accenture LLP dated July 14, 2004, which is governed by the laws of the State of New York.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties.  Hertz is a citizen of Delaware and Florida, whereas Accenture is a citizen of Illinois.  Moreover, Hertz has suffered damages many times greater than $75,000, exclusive of interests and costs, as a result of Accenture's breaches.

20.     Accenture is subject to personal jurisdiction in this judicial district because many of the letters of intent and statements of work that comprise the contract between Hertz and Accenture were executed with Accenture's Manhattan office and specify that they are governed

by New York law.   Moreover, Accenture's contacts with the Southern District of New York are

continuous and systematic.  Accenture is registered to do business in New York and has

appointed an agent for service of process.  The Accenture office in Manhattan, at 1345 Avenue

of the Americas, New York, New York 10105, is one of Accenture's largest offices and

contributes a substantial portion of its revenue.

21.     Venue is proper in this Court under 28 U.S.C. § 1391 (b) and 1391(c) because

Accenture is physically present in this district, is subject to personal jurisdiction here, and

regularly conducts business here.

## FACTUAL ALLEGATIONS

### Hertz Undertakes a Digital Transformation Program

22.     Hertz operates the Hertz, Dollar, and Thrifty vehicle rental brands in

approximately 10,200 corporate and franchisee locations throughout North America, Europe, the

Caribbean, Latin America, Africa, the Middle East, Asia, Australia, and New Zealand.

23.     In early 2016, after conducting an internal review of its website and mobile

applications, Hertz conceived and undertook an initiative to transform and redefine the customer

experience on Hertz's digital platforms (the "Project").

24.     A central objective of the Project was to develop a new, market-leading Hertz-

brand website and suite of mobile applications, all based on a platform that Hertz could readily

extend to create new websites and mobile applications for each of Hertz's other brands,

including Dollar and Thrifty.

25.     In March 2016, Hertz engaged Accenture to assist Hertz in validating its strategy

and planning for the Project.  The engagement was governed by a Consulting Services

Agreement (the "Agreement") between Hertz and Accenture that had been in place since 2004.

**Hertz Selects Accenture To Design and Build Its Website And Mobile Applications**

26.     In the summer of 2016, Hertz requested proposals from several of the leading technology services providers.  Hertz provided information, reviewed the proposals, and met with candidates.  Hertz eventually selected Accenture, relying on Accenture's claimed world-class expertise in website and mobile application development.

27.     The Project was conducted in phases, with the scope of services and the deliverables for each phase specified in executed letters of intent and/or statements of work. Each of the letters of intent and statements of work was governed by the Agreement.

28.     Between August 2016 and November 2016, Hertz and Accenture entered into four statements of work and letters of intent for Phase 1 of the Project.  These statements of work and letters of intent covered a range of project planning services, included gathering requirements, evaluating Hertz's existing technology, understanding the user experience, and ultimately developing a "Solution Blueprint" that would describe the functionality, business processes, technology, and security aspects that were to be incorporated into the solution.

29.     During the course of Phase 1, Hertz provided Accenture with detailed information about Hertz's existing IT systems' business requirements. The work product created during Phase 1 included the Solution Blueprint, a "Delivery Plan," and "Architecture Specifications" that were intended to structure Accenture's subsequent development and deployment of the new technology platform, website, and suite of mobile applications.  Hertz paid Accenture nearly $7 million for these services and deliverables.

30.     Effective January 30, 2017, Accenture and Hertz entered into a Letter of Intent ("Phase 2 LOI") to document specific design, build, test, validate, and deploy the website, mobile applications, and other deliverables.  The parties later replaced the Phase 2 LOI with a

statement of work ("Phase 2 SOW"), effective September 1, 2017.  Hertz ultimately paid

Accenture more than $26 million in connection with Phase 2 of the Project.

31.     The Phase 2 SOW incorporated the Phase 2 LOI by reference and specified in

further detail the Services that Accenture agreed to provide to support the Project.  During Phase

2, Accenture agreed to take responsibility for completing all of the most significant tasks

required to deploy new Hertz-branded North American website and mobile applications and the

supporting infrastructure; Hertz was responsible for only a limited set of tasks necessary to

support Accenture's work.

32.     Pursuant to the Phase 2 LOI and SOW, Accenture was required to provide

"Project Management" Services, including Accenture's obligation to "[p]lan, control, and lead

the execution of Accenture's scope of services."

33.     Accenture committed to a December 2017 "go-live" date for the website and

mobile apps.  In the Phase 2 SOW Accenture expressly acknowledged that Hertz's "priority

outcomes" included Accenture's commitment to "a focused objective of launching the [website

and mobile applications] platforms and experience in December 2017."

## Accenture Delivers Seriously Deficient Work Product

34.     Accenture never delivered a usable website and mobile applications.

35.     First, in September 2017, Accenture reported that it would not be able to meet the

promised go-live date of December 2017 and requested that it be pushed back to January 2018.

Not long afterward, Accenture recognized that it had been overly optimistic about its ability to

perform, and requested that the go-live date be further postponed, until April 2018.

36.     One of the primary reasons for these delays was Accenture's difficulty in

developing the "integration layer," which allowed the customer-facing FED code to

communicate with Hertz's back-end systems (e.g., the systems for making and changing reservations, and the systems for Hertz's rewards program). Accenture's team struggled to understand the back-end systems and apparently had difficulty programming the software used for the integration layer.

37.     In addition, Accenture was unable to properly develop the FED code. Accenture expressly acknowledged its failure in a slide presentation it prepared for a January 2018 status meeting, stating that "Front End Technology (Angular2) has been a challenge for us to deliver."

38.     Accenture severely understated its problems with the FED code. After Hertz replaced Accenture, an assessment of that code revealed that Accenture's FED code was so badly written that it could not be remediated. Accenture's replacement discarded it entirely.

39.     Accenture's code for the AEM component (the content management system that allows Hertz to create, edit, and change the content on its websites) was seriously flawed as well. The coding and file structure were not based upon the Adobe AEM archetype, which made the application unreliable and difficult to maintain, as well as making future updates challenging and inefficient.

40.     Accenture's Java code did not follow the Java standard, displayed poor logic, and was poorly written and difficult to maintain.

41.     Accenture's team also recommended that Hertz purchase licenses to a technology called RAPID that was supposed to streamline the development of the content management system for Hertz's new websites. Hertz followed this recommendation and acquired the technology, but Accenture was unable to implement it. As Accenture's project leaders acknowledged, Accenture "spent a good deal of time" "fighting through integration of RAPID" into Hertz's environment.

42.     These technical struggles were worsened by Accenture's project management failures.  In the midst of Phase 2 of the Project, for instance, Accenture removed some of the most significant team members, including the product owner and the microservices architect. They were replaced, but their replacements did not have the same level of experience, and a good deal of knowledge was lost in the transition.  Accenture acknowledged that its delays and difficulties resulted, at least in part, from the departure of "key resources" during the Project.

43.     In or about December 2017, Accenture promised that Hertz would not be responsible for the added cost associated with the delays in go-live, but Accenture later sought to charge Hertz for those costs.

**Accenture Failed and Refused To Deliver What It Had Promised**

44.     Other problems on the Project were caused by Accenture's failure or refusal to deliver what it had committed to deliver.

45.     For instance, one of the most fundamental requirements that Accenture understood and agreed to deliver from the outset on the Project was that Accenture would develop a code base for the website and mobile applications that was extensible to multiple brands and markets, including the Hertz brand outside of North America and the Dollar and Thrifty brands globally.

46.     This fundamental requirement appears throughout the Project documents.  The Architecture Specifications and Phase 2 Statement of Work, for example, expressly declared that "[a] core tenet of the application is its extensibility" and "[e]ach brand will be supported by the parent-child app architecture and codebase, with variation only in component configuration, content authoring, and aesthetic branding via CSS."

47.     Similarly, the Solution Blueprint specified that Accenture would "[a]utomate and integrate where possible to scale across brands and globally both in terms of a platform as well as products and services," that the Project "solution will be architected to support multiple brands within the Hertz family (Hertz, Dollar, Thrifty, Sales) and multiple geographies," and that "the program will create an underlying platform that will be used to support all of Hertz's brands and digital channels in the future."

48.     Inexplicably, Accenture chose not to follow this key principle.  Instead of delivering an architecture and code that was extensible, Accenture tailored the Project codebase to support only a single brand in a single market – the Hertz brand in North America.

49.     When Hertz first attempted to build out Dollar and Thrifty sites using Accenture's code base, it discovered that Accenture's code base was specific to the Hertz brand in North America and that if it wanted to add a new site, the components of the site would have to be duplicated, resulting in significant additional cost and effort that Hertz contracted to avoid.

50.     Hertz raised this issue directly with Accenture.  In response, Accenture's project leader replied that "we felt that creating a generic base and extending Hertz from that would have been less useful and less productive."

51.     Put simply, Accenture decided, of its own accord and without telling Hertz, that it would disregard the fundamental requirements and specifications of the Project.  Accenture developed an architecture and code that ***deliberately*** was not extensible.

52.     Another of Hertz's core requirements for the Project was the development of a responsive website – that is, one that automatically scales content and elements to match the screen size of the device on which the website is viewed.

53.     The statements of work and Solution Blueprint expressly required Accenture to provide a "responsive website and native mobile app site map, wireframes and visual designs"; "responsive templates based on the approved user  stories, wireframes and visual designs provided in each sprint"; a "Responsive Grid Structure" with small, medium, and large breakpoints; and to support "Medium (Tablet) browsers. . . ."

54.     The designs that Accenture delivered did not conform to these specifications; Accenture created only two sizes: small and large.

55.     Accenture acknowledged that its design did not work for many devices, including tablets.  Hertz specifically pointed out this defect on many occasions, but Accenture refused to fix it unless Hertz paid it hundreds of thousands of dollars in additional fees.

56.     Accenture also failed to develop a usable Visual Style Guide in the format specified by Hertz.

57.     The purpose of the Visual Style Guide was to ensure consistency for developers across all of the pages of the website.  The Visual Style Guide was supposed to "[e]stablish rules governing the look and feel of all pages in the product[, d]ocument all the decisions made on the user interface design from the other tasks[, and p]rovide guidelines for prototype developers to ensure consistency across the site/application."

58.     Accenture agreed to develop the "structure and format of this key Deliverable" as specified by Hertz.

59.     Hertz specified that the Visual Style Guide must be developed in an interactive format—not a static PDF format – because a static format would quickly become stale and would make it more difficult for developers to build consistent visual elements across the

platform.  An interactive style guide would allow developers to cut and paste visual elements and code.

60.     The requirement for an interactive format was clearly set out; Hertz even sent Accenture interactive style guides to use as exemplars, but Accenture repeatedly produced iterations of a Visual Style Guide in static PDF format.

61.     When Hertz raised this issue with Accenture, Accenture refused to provide an interactive Visual Style Guide to remedy the defects in its Deliverables unless Hertz paid hundreds of thousands of dollars in additional fees.

62.     Accenture never delivered the Visual Style Guide in the structure and format that Hertz specified.

63.     In view of these pervasive deficiencies and problems, and following an outside assessment of the Project, Hertz decided to replace Accenture with a new provider.  Hertz brought the new provider onto the Project in June 2018, and ended Accenture's engagement shortly thereafter.

64.     After Accenture was removed from the Project, Hertz learned that Accenture had not properly tested the Deliverables.  It had performed only selected tests, which tended to conceal Accenture's deficient work.

65.     The Phase 2 SOW required Accenture to develop, configure, and execute tests of the source code and configuration; to conduct performance testing to validate that the system would support expected usage volumes; and to conduct end-to-end tests to ensure that the system operated as it was supposed to and integrated properly with Hertz's back-end systems.

66.     Accenture's testing was incomplete, selective, and, in some cases, deceptive. Accenture did not test many components.  Much of the testing that was performed was "happy

path" testing, in other words, testing to see whether the website or mobile application performs as designed under scenarios in which hypothetical customers use the website or mobile application exactly as they are supposed to. This kind of testing is inadequate because it does not assess performance under real world scenarios and does not test for error handling.

67. Since it removed Accenture in May 2018, Hertz has invested enormous effort and resources into getting the Project back on track and mitigating its damages. Hertz has worked hand-in-hand with Accenture's replacement to develop the world-class digital experience that Accenture promised but failed to deliver, and it expects to roll out that new technology shortly.

68. Hertz now brings this action to recover the damages that it has sustained as a result of Accenture's breaches and wrongful conduct.

## COUNT I
### Breach of Contract

69. Hertz repeats and re-alleges paragraphs 1 through 68 as if set forth herein.

70. The Agreement (including the statements of work and letters of intent) is clear, unequivocal, supported by consideration, and legally binding.

71. Hertz performed all of its duties and obligations under the Agreement in good faith.

72. In the Agreement, Accenture committed to perform "the consulting services (the 'Services') and create the Deliverables . . . specified in . . . mutually agreed upon arrangement letters or statements of work to this Agreement."

73. In the Agreement, Accenture warranted that all "Deliverables . . . shall materially conform to their relevant specifications" at the time of delivery and for a period of time thereafter.

74.     Accenture further warranted that the "Services will be performed in a good and workman-like manner."

75.     Accenture breached its warranties.

76.     Accenture did not perform the services in a good and workmanlike manner.

77.     The deliverables prepared and delivered by Accenture did not materially conform to their specifications at the time of delivery.

78.     Accenture refused to remedy the defects in its services and deliverables.

79.     By its conduct, Accenture materially breached the Agreement.

80.     As a result of Accenture's repeated breaches, Hertz has suffered and continues to suffer damages in an amount to be proven at trial. Hertz's damages include, without limitation, the tens of millions of dollars that it paid to Accenture for the deficient services and deliverables, as well as the millions of dollars in additional costs that it has incurred in remediating and completing the Project.

**COUNT II**
**Florida Deceptive and Unfair Trade Practices Act (F.S.A. § 501.201)**

81.     Hertz repeats and re-alleges paragraphs 1 through 80 as if set forth herein.

82.     Accenture engaged in a pattern of unfair, deceptive, and extortionate actions in its dealings with Hertz.

83.     Accenture misrepresented the skills and expertise of its staff.  In the request for proposals that Hertz issued to vendor candidates in the summer of 2016, Hertz specifically asked Accenture to provide information about its resource model and the qualifications of its personnel. In its responses, Accenture expressly represented that its staff consisted of "800 Experts" who comprised "The best talent in the world."  Accenture expressly stated to Hertz that "We've got

the skills you need to win," and it represented to Hertz that it would "put the right team on the ground day one. [*sic*]"

84.     Accenture's personnel were not experts, however.  Rather, when the project entered the development phase, it became apparent that many of Accenture's developers, particularly the developers located offshore, were junior, inexperienced, and not familiar with – let alone "expert" in – the various technologies that Accenture recommended to Hertz.

85.     Accenture architected the Hertz digital platform so that it consisted of multiple "layers."  The front-end layer, which refers to the screens and interface presented to visitors to the website, was to be developed using a framework called "Angular."  Next, a content management system, Adobe Experience Manager (AEM), allowed Hertz to update and revise the content that appeared on the site.  The next layer was the "microservices" layer, comprised of code that performed various "services," such as searching for a Hertz location or for a type of vehicle, or writing a review, sending an email to a Hertz representative, etc.  Then the "integration layer" allowed the customer-facing front-end code to request and receive data from Hertz's back-end systems (e.g., the systems for making and changing reservations, and the systems for Hertz's rewards program), using a technology known as "MuleSoft".

86.     Accenture's developers were far from "expert" in these technologies.  The front-end developers were not familiar with and did not understand Angular.  Accenture expressly acknowledged this in a January 2018 status meeting, stating that "Front End Technology (Angular2) has been a challenge for us to deliver."

87.     The developers did not properly develop the front-end Javascript code; their code did not comply with the Java standard, displayed poor logic, and was badly written.

88.     Accenture's developers were also inexperienced with the AEM code, creating a file structure and code that were not based upon the AEM standard archetype.

89.     Accenture's team recommended that Hertz use a technology called RAPID that was supposed to streamline the development of the content management system for Hertz's new websites.  Accenture first made this recommendation in the solution blueprint and in architecture documents, and later in response to direct questions posed by Hertz in email. Accenture's designers expressly noted in the solution blueprint that the use of RAPID required expertise and "careful considerations with respect to authoring and the interaction of the RAPID Javascript with the AEM," but Accenture led Hertz to understand that its developers had the required expertise to use RAPID properly. This representation was false.  As Accenture's project leaders acknowledged, Accenture "spent a good deal of time" "fighting through integration of RAPID" into Hertz's environment.

90.     Accenture's developers also misrepresented the extent of their testing of the code. Substantial portions of the code were "commented-out," meaning that a developer marked the code to identify it as an explanatory comment, rather than actual programming code, during testing.  The commented-out code is ignored during testing, so that it appears that the component functions properly when in fact it does not.

91.     The preceding paragraphs provide some examples of Accenture's unfair and deceptive conduct; they are not exhaustive.

92.     Hertz was harmed by Accenture's unfair and deceptive conduct.  Hertz reasonably relied upon Accenture's representations about the expertise of its developers when it chose to hire Hertz.  Hertz also spent substantial sums to acquire licenses to the RAPID technology in reliance upon Accenture's misrepresentations.  Hertz has had to scrap significant amounts of the

work product that Accenture created, and that Hertz paid for, because it was sub-standard and not usable.

93.      Accordingly, Hertz suffered significant financial damages as a result of Accenture's unfair and deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Hertz, through its attorneys, respectfully requests the following relief:

1.      Enter judgment that Accenture breached the Agreement with Hertz.

2.      Enter judgment awarding Hertz all of the damages that it has incurred as a proximate result of Accenture's breaches.

3.      Enter judgment awarding Hertz its actual damages as a result of Accenture's unfair and deceptive acts.

4.      Enter judgment awarding Hertz its attorneys' fees and costs pursuant to F.S.A. §501.201.

5.      Order any other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Hertz hereby requests a jury trial on any and all claims so triable.

Dated: New York, New York          **BROWN RUDNICK LLP**
       June 14, 2019


By:  _/s/ *Edward J. Naughton*_____

Edward J. Naughton (*pro hac vice*)
Rebecca M. Lecaroz (*pro hac vice*)
Kyle P. Dorso (*pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
enaughton@brownrudnick.com
rlecaroz@brownrudnick.com
kdorso@brownrudnick.com

-and-

D. Cameron Moxley
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
cmoxley@brownrudnick.com

*Counsel for Plaintiff The Hertz Corporation*