**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| THE HERTZ CORPORATION, | : | |
| | : | Case No. 19 Civ. 3508 (WHP) |
| Plaintiff, | : | |
| | : | |
| v., | : | |
| | : | |
| ACCENTURE LLP, | : | |
| | : | |
| Defendant. | : | July 15, 2019 |
| _____ | : | |

**ACCENTURE LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
DISMISS THE HERTZ CORPORATION'S CORRECTED FIRST AMENDED
COMPLAINT**

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Introduction ..................................................................................................................... 1

Background ....................................................................................................................... 2

    I.     The Consulting Services Agreement ......................................................... 2

    II.    The Project ................................................................................................. 3

    III.   The Alleged Misrepresentations ............................................................... 5

Argument .......................................................................................................................... 8

    I.     Hertz fails to allege a legally valid FDUTPA claim. ................................ 8

            A.    Applicable Legal Standards ........................................................... 8

            B.    Accenture's supposed failure to deliver services required
                  by the SOWs cannot support a FDUTPA claim. ..................................... 10

            C.    Hertz's FDUTPA claim based on alleged
                  "misrepresentations" also fails................................................................ 11

                  1. The marketing statements fail to support a claim. ............................... 12

                  2. Hertz's remaining FDUTPA allegations do not satisfy
                  Rule 9(b). .............................................................................................. 17

    II.    Hertz is barred from recovering consequential damages. ...................... 19

            A.     Hertz may not recover consequential damages under
             FDUTPA ........................................................................................ 19

             B.    Consequential damages are also barred by the CSA. .................... 20

Conclusion ....................................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ADT LLC v. Vivint, Inc.*,
  No. 17-CV-80432, 2017 WL 5640725 (S.D. Fla. Aug. 3, 2017) ...........................................20

*Mayor v. Jean Philippe Fragrances, Inc.*,
  No. 92 CIV. 6217 (LBS), 1994 WL 9684 (S.D.N.Y. Jan. 10, 1994).....................................22

*Amar Shakti Enterprises, LLC v. Wyndham Worldwide, Inc.*,
  No. 6:10-CV-1857-ORL-31, 2011 WL 3687855 (M.D. Fla. Aug. 22, 2011) ........................16

*Am. List Corp. v. U.S. News and World Report, Inc.*,
  549 N.E.2d 1161 (N.Y. 1989)................................................................................................21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................................2, 9

*Barack v. Seward & Kissel, LLP*,
  No. 16CV9664, 2017 WL 4023141 (S.D.N.Y. Sept. 12, 2017) .............................................4

*Barilli v. Sky Solar Holdings, Ltd.*,
  No. 17 CV 4572-LTS-DCF, 2019 WL 2250445 (S.D.N.Y. May 23, 2019) ..........................14

*C&C Int'l Computers & Consultants, Inc. v. Dell Marketing, L.P.*,
  No. 11–60734–CIV–ZLOCH, 2011 WL 13217489 (S.D. Fla. Nov. 7, 2011) ...........10, 17, 19

*Carriuolo v. Gen. Motors Co.*,
  823 F.3d 977 (11th Cir. 2016) ......................................................................................9, 12, 14

*United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*,
  865 F.3d 71 (2d Cir. 2017).....................................................................................................10

*Daniel v. Tootsie Roll Indus., LLC*,
  No. 17 CIV. 7541 (NRB), 2018 WL 3650015 (S.D.N.Y. Aug. 1, 2018) .................................4

*Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*,
  No. 15-81062-CIV, 2016 WL 4256916 (S.D. Fla. May 16, 2016)........................................20

*DynCorp v. GTE Corp.*,
  215 F. Supp. 2d 308 (S.D.N.Y. 2002)....................................................................................22

*Fink v. Times Warner Cable*,
  714 F.3d 739 (2d Cir. 2017)...................................................................................................12

*In re: Gen. Motors LLC Ignition Switch Litig.*,
　No. 14-MD-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016) ............................9, 14

*Greenberg v. Chrust*,
　282 F. Supp. 2d 112 (S.D.N.Y. 2003) ......................................................................................15

*HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*,
　703 F. App'x 814 (11th Cir. 2017) ..........................................................................................20

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
　62 F.3d 69 (2d Cir. 1995) ..........................................................................................................2

*James D. Hinson Elec. Contracting Co. v. BellSouth Telecommunications, Inc.*,
　275 F.R.D. 638 (M.D. Fla. 2011)..............................................................................................14

*Jsurgical, Inc. v. Synergy Health PLC*,
　No. 8:18-cv-1022-T-30JSS, 2018 WL 7502042 (M.D. Fla. June 15, 2018) .........................10

*Kennedy v. Deschenes*,
　No. 17-60110-CIV, 2017 WL 2223050 (S.D. Fla. May 19, 2017)..........................................15

*United States ex rel. Ladas v. Exelis, Inc.*,
　824 F.3d 16 (2d Cir. 2016)........................................................................................................18

*In re Lehman Bros. Holdings Inc.*,
　544 B.R. 62 (Bankr. S.D.N.Y. 2015) ......................................................................................21

*M Sports Prods. v. Pay-Per-View Network, Inc.*,
　1998 WL 19998 (S.D.N.Y. Jan. 20, 1998) ..............................................................................21

*Marino v. Lewis*,
　792 N.Y.S.2d 572 (2d Dep't 2005)...........................................................................................22

*Marketran, LLC v. Brooklyn Water Enterprises, Inc.*,
　2016 WL 8678548 (S.D. Fla. Aug. 31, 2016).........................................................................11

*Metro. Switch Bd. Mfg. Co. v. B & G Elec. Contractors, Div. of B & G Indus.,*
　*Inc.*,
　96 A.D.3d 725 (2d Dep't 2012) ................................................................................................22

*Mom's Bagels of New York, Inc. v. Sig Greenebaum, Inc.*,
　164 A.D.2d 820 (N.Y. 1990) ....................................................................................................21

*Oliver v. Rio Acquisition Partners, LLC*,
　No. 2019 WL 801952, 2019 WL 801952 (S.D.N.Y. Feb. 21, 2019)........................................9

*Process Am., Inc. v. Cynergy Holdings, LLC*,
　839 F.3d 125 (2d Cir. 2016)......................................................................................................20

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ................................................................12

*Rosa v. Amoco Oil Co.*,
  262 F. Supp. 2d 1364 (S.D. Fla. 2003) ................................................15

*S.E.C. v. Egan*,
  994 F. Supp. 2d 558 (S.D.N.Y. 2014) ...................................................4

*SeaMiles, LLC v. Carnival Corp.*,
  No. 09-23382, 2009 WL 10667772 (S.D. Fla. Nov. 23, 2009) .............10

*Segovia v. Vitamin Shoppe, Inc.*,
  No. 14-CV-7061 (NSR), 2016 WL 8650462 (S.D.N.Y. Feb. 5, 2016) ............10, 17

*Simony v. Fifth Third Mortg. Co.*,
  No. 2:14-CV-387-FTM-29, 2014 WL 5420796 (M.D. Fla. Oct. 22, 2014) ..........16

*Sterling Fed. Bank, F.S.B. v. Credit Suisse First Bos. Corp.*,
  No. 07-C-2922, 2008 WL 4924926 (N.D. Ill. Nov. 14, 2008) ................21

*Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co.*,
  No. 02 CIV. 8123 (NRB), 2003 WL 22004888 (S.D.N.Y. Aug. 25, 2003) ..........22

*Thompson v. Procter & Gamble Co.*,
  No. 18-CV-60107, 2018 WL 5113052 (S.D. Fla. Oct. 19, 2018) ...........14

*Tyman v. Pfizer, Inc.*,
  16-CV-06941, 2017 WL 6988936 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted*, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018) ...........11, 12

*Unilever United States, Inc. v. Johnson Controls, Inc.*,
  No. 16-CV-01849, 2017 WL 622209 (N.D. Ill. Feb. 15, 2017) .............21

*Vital Pharm., Inc. v. Balboa Capital Corp.*,
  No. 14-62469-CIV, 2016 WL 4479370 (S.D. Fla. Aug. 25, 2016) ........15

*Vorst v. TBC Retail Grp., Inc.*,
  No. 12-CV-80013, 2012 WL 13026643 (S.D. Fla. Apr. 12, 2012) ........15

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
  No. 07 Civ. 3994, 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) ............14

*Zlotnick v. Premier Sales Grp., Inc.*,
  431 F. Supp. 2d 1290 (S.D. Fla. 2006), *aff'd*, 480 F.3d 1281 (11th Cir. 2007) ......15

**Statutes**

Fla. Stat. § 501.201 ..........................................................................................8

Fla. Stat. § 501.204 ...........................................................................................................8

Fla. Stat. § 501.212 .........................................................................................................19

Florida Deceptive and Unfair Trade Practices Act (FDUTPA)...........................................*passim*

N.Y. Prac., Contract Law § 22:34.......................................................................................22

**Other Authorities**

Fed. R. Civ. P. 9 ............................................................................................*passim*

Fed. R. Civ. P. 8 .........................................................................................................2, 9, 19

**INTRODUCTION**

The Hertz Corporation ("Hertz") is a sophisticated party, describing itself as "one of the world's largest and most familiar vehicle rental companies."  First Corrected Am. Compl. ¶ 1, ECF No. 26. ("AC" or "Amended Complaint").  Hertz retained Accenture LLP ("Accenture"), a global technology services provider, to assist it in redesigning and remaking its customer-facing website and mobile applications (the "Project").  As the governing agreements reflect, each party had responsibilities for areas of the Project.  In this lawsuit, Hertz claims that certain work Accenture performed on the Project was deficient and that Accenture was responsible for Project delays.  Accenture is confident that discovery will show that it complied with its contractual obligations and that this action was prompted not by its performance, but by its request to be paid its outstanding fees.  But those issues are for another day, following discovery.  There are, however, two issues that can be resolved now, and which will properly focus this case on what it is—a routine breach of contract action.

Hertz itself acknowledges that the "nature of th[is] action" is "for breach of contract." AC ¶ 18.  Yet, in an effort to seek remedies not permitted by the parties' extensively negotiated agreements, Hertz asserts a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  When Accenture indicated its intent to move to dismiss this claim as merely duplicative of the breach of contract claim, Hertz filed its Amended Complaint, in which it attempted to salvage the FDUTPA claim by citing to purported "misrepresentations" by Accenture, such as that Accenture had "the best talent in the world" and "the skills you need to win."  According to Hertz, these generalized statements, made in a presentation before Accenture was retained on this Project, were deceptive because many months (and multiple agreements) later, the Project ran into problems.  This claim is meritless.  Hertz identifies no statements by Accenture that were false, much less that could have deceived a reasonable business in Hertz's

1

position.  And Hertz's other FDUTPA allegations fall far short of the "who, what, when, where, and how" required to plead a claim, like this one, subject to Rule 9(b)'s pleading standards, or even the plausibility standard required by *Iqbal* for claims subject to Rule 8.

Hertz also appears to seek consequential damages including lost revenues allegedly attributable to the delays on the Project.  To the extent Hertz seeks such recovery, it is barred both by FDUTPA and the parties' contract and should be dismissed.  Narrowing this case now will conserve judicial and party resources by streamlining discovery and facilitating resolution of the case.

## BACKGROUND

### I.     The Consulting Services Agreement

Hertz is a well-known Fortune 500 vehicle rental company with 10,500 locations around the world.  *See, e.g.*, AC ¶¶ 1, 22.  In 2004, it entered into a Consulting Services Agreement with Accenture (the "CSA").  *Id.* ¶ 25 (explaining that engagement was governed by CSA); Ex. A to Declaration of William Levy ("Levy Decl.") (CSA).[1]  The CSA serves as a framework agreement: It does not identify any particular consulting services Accenture would provide to Hertz.  Instead, Accenture's responsibilities for any specific consulting project would be governed by "mutually agreed upon arrangement letters or statements of work to this Agreement, signed by both parties, each of which will incorporate the terms and conditions of this Agreement ('Appendix' or 'Appendices')."  CSA ¶ 1.1.  Under the CSA, Accenture was to be

---

[1] Hertz did not attach the CSA or the relevant Statement of Work to its complaint, but the Court may nonetheless consider these documents because they are expressly referenced in the Amended Complaint (*e.g.*, AC ¶ 70 (citing "Agreement (including the statements of work and letters of intent)") and form the legal basis for Hertz's breach of contract claims.  They are therefore integral to Hertz's complaint and are appropriately reviewed on a motion to dismiss.  *See, e.g.*, *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

paid for the services it performed on a time and materials basis. CSA ¶¶ 2; 1.2.

Two terms of the CSA are relevant here.  First, the CSA barred Accenture from being liable "for any consequential, incidental, indirect, special or punitive damage, loss or expenses (including but not limited to business interruption, lost business, lost profits, or lost savings)." CSA ¶ 9.2.  Instead, "the sole liability of Accenture . . . for any claim in any manner related to this Agreement . . . shall be the payment of direct damages and such damages shall in no event in the aggregate exceed the fees and expenses received by Accenture under this Agreement with respect to the work involved under the applicable Appendix."  *Id.* ¶ 9.1.

Second, the CSA disclaimed any representations or warranties other than those contained in the CSA:

> THIS SECTION . . . IS ACCENTURE'S ONLY EXPRESS WARRANTY CONCERNING THE SERVICES, ANY DELIVERABLES AND ANY WORK PRODUCT, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, CONDITIONS AND REPRESENTATIONS. . . .

*Id.* ¶ 6.  Similarly, the Agreement contained a "Complete Agreement" clause stating it set forth "the entire understanding between the parties and supersedes all prior agreements, conditions, warranties, representations, arrangements and communications, whether oral or written."  *Id.* ¶ 11.1.  The Agreement is governed by New York law. *Id.* ¶ 11.8.

## II.    The Project

In early 2016, Hertz began planning a Project to remake its customer-facing website, mobile apps, and associated technology platforms.  AC ¶¶ 1, 23–24.  Hertz requested proposals from several technology service providers, including Accenture, for assistance on the Project. *Id.* ¶ 26.  In connection with the selection process, in the summer of 2016, Accenture made a

presentation to Hertz.  AC ¶ 83; *see also* Ex. C to Levy Decl. (PowerPoint Presentation).[2]  Hertz

ultimately selected Accenture as one of the vendors on the Project.  AC ¶ 26.

The Project was to take place in phases, with the services Accenture would provide in

each phase governed by separately negotiated and executed Statements of Work ("SOWs").  *Id.*

¶ 27. Between August and November of 2016, Hertz and Accenture entered into four distinct

SOWs and letters of intent relating to Phase 1 of the project.  *Id.* ¶ 28.  During Phase 1,

Accenture provided a range of planning services and developed a blueprint for Hertz's redesign

of its technology platforms.  *Id.*  Hertz paid Accenture about $7 million in fees for this part of the

project. *Id.* ¶ 29.  Hertz does not allege any deficiencies in Accenture's services related to Phase

1 of the Project.[3]

The parties then moved into Phase 2 of the Project, with Accenture agreeing to provide

certain services related to building and implementing the design developed in Phase 1.  This

phase of the Project was governed by a separate letter of intent, dated January 30, 2017, which

---

[2] The Court may consider this presentation because it is referred to and quoted from in the Amended Complaint and forms a basis for Hertz's FDUTPA claim.  *E.g.*, *Barack v. Seward & Kissel, LLP*, No. 16CV9664, 2017 WL 4023141, at *1 n. 1 (S.D.N.Y. Sept. 12, 2017) (Pauley, J.) (considering letter of intent on motion to dismiss because "[a]lthough this July 21, 2014 letter of intent is not expressly referenced in the Complaint, the Complaint relies upon information contained within that letter, including the transaction's payment terms"); *S.E.C. v. Egan*, 994 F. Supp. 2d 558, 564 (S.D.N.Y. 2014) ("[C]ourts must consider the complaint in its entirety, as well as ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").  Likewise, the Court may consider the complete allegedly deceptive material.  *E.g.*, *Daniel v. Tootsie Roll Indus., LLC*, No. 17 CIV. 7541 (NRB), 2018 WL 3650015, at *12 n.8 (S.D.N.Y. Aug. 1, 2018) ("Although the First Amended Class Action Complaint only includes depictions of the front of the Products' packaging, Brown's declaration provides images of the back corresponding to each box, which we may consider on a motion to dismiss.").

[3] Moreover, any such claim would be time-barred because Accenture delivered these services and completed its work on Phase 1 of the project in 2016, more than two years before Hertz brought the present suit.  *See* CSA ¶ 9.2 (providing that "[a]ny action by either party must be brought within two (2) years after the cause of action arose").

were later subsumed by a Phase 2 SOW, effective September 1, 2017. *Id.* ¶¶ 30–31, *see* Ex. B to Levy Decl. (Phase 2 SOW). Under the Phase 2 SOW, each party had responsibilities for specific portions of the Project. For example, Accenture was responsible for building the front-end development code, the Adobe Experience Manager and the microservices integration layer, while Hertz was responsible for the environment buildout, "designing and implementing mid-tier (ESB) and backend legacy integrations" (also known as the Mulesoft integration layer), as well as security and user acceptance testing. Ex. B to Levy Decl., Phase 2 SOW, Sections 2.1 and 2.2. In addition, the Phase 2 SOW provided that all website content (without which the website could not launch) was not Accenture's responsibility. *Id.*, Section 2.3 (out-of-scope services). Under the Phase 2 SOW, each party was responsible for certain project management functions. *Id.*, Section 2.1 (Accenture's responsibilities included: "[p]lan, control, and lead the execution of Accenture's scope of services...."); Section 3.2 (Hertz's project manager was "[r]esponsible for overall project management for the Hertz workstreams" including supervision of other third-party service providers working on the Project).

The Phase 2 SOW, like the CSA, made clear that this was not a fixed price contract. Rather, Accenture was to be paid on a "time and materials basis." *Id.*, Section 7. Hertz asserts it ultimately paid $26 million in fees for this part of the Project. AC ¶ 30. Hertz alleges that there were technical deficiencies and delays associated with Accenture's work on the second phase of the Project. *See* AC ¶¶ 34–68. Accenture strongly disputes Hertz's factual allegations, but those issues can only be resolved with discovery. Ultimately, Hertz decided in May 2018 to terminate Accenture's involvement in the Project. AC ¶¶ 8, 67.

### III.   The Alleged Misrepresentations

While the bulk of Hertz's Amended Complaint is focused on Accenture's alleged breach of contract, in an effort to avoid dismissal of its FDUTPA claim, Hertz points to a handful of

5

alleged "misrepresentations" made by Accenture.  According to Hertz, the majority of these were

made in connection with Accenture's presentation to Hertz in the summer of 2016.  AC ¶ 83.

Specifically, Hertz's Amended Complaint references three statements from a PowerPoint

presentation provided by Accenture, which is dated June 2016.  Page 32 of the presentation

contains the statement: "We've got the skills you need to win."  Ex. C; *see also* AC ¶ 83

(referencing statement).



As can be seen, this statement provides a high-level overview of Accenture's capabilities.  It is

made in the context of explaining that Accenture can "bring together design, development and

strategy."  *Id.*  To that end, the page shows a diagram showing the benefits of this multifaceted

approach and states that "[w]e believe the best digital products are created when designers and

developers work hand in hand."  *Id.*

On Page 33, Hertz points to the words "800 Experts" and "The best talent in the world."



Ex. C; *see also* AC ¶ 83 (referencing statements).  Page 33 is not specific to the Project, but instead provides general background on Accenture's digital business, including a partial listing of its offices around the world, and the number of its studios and clients.  *Id.*

Hertz also alleges that during the selection process, Accenture represented that it would "put the right team on the ground day one."  AC ¶ 83.[4]

Hertz alleges that these statements were false because during the development phase— which occurred many months and multiple letters of intent/SOWs later—"many of Accenture's developers ... were junior, inexperienced and not familiar with ... the various technologies that Accenture recommended to Hertz."  AC ¶ 84.

In addition to these statements, Hertz alleges that at an unidentified date, an unidentified person from Accenture "led Hertz to understand that its developers had the required expertise to

_____

[4] This statement does not appear in the same PowerPoint presentation, but was allegedly also made in connection with the initial selection process in the summer of 2016.  AC ¶ 83.

use [a technology called] RAPID properly."  AC ¶ 89.  Hertz does not specify what Accenture

actually said in this regard.  Hertz claims this "understanding" was false because Accenture later

stated that it "'spent a good deal of time' 'fighting through integration of RAPID' into Hertz's

environment."  *Id.*  Hertz also alleges that Accenture "misrepresented the extent of their testing

of the code" because "[s]ubstantial portions of the code were 'commented out,'" meaning that

this code was "ignored during testing."  AC ¶ 90.

## ARGUMENT

Two aspects of Hertz's claims are appropriately resolved on a motion to dismiss pursuant

to Federal Rule of Civil Procedure 12(b)(6), as they fail to state a claim upon which relief can be

granted.  First, Hertz's claim that Accenture violated the Florida Deceptive and Unfair Trade

Practices Act ("FDUTPA"), Fla. Stat. § 501.201, should be dismissed. Hertz claims that

Accenture violated FDUTPA by making the purported misrepresentations described above.  *Id.*

However, Hertz does not even allege these statements are false, let alone that a reasonable

business would rely on them.  Moreover, Hertz has failed to plead certain of the statements with

sufficient specificity to meet the requirements of Rule 9(b).

Second, both FDUTPA and the parties' agreements provide that Hertz may not recover

consequential damages such as lost revenue.  Yet, Hertz's Amended Complaint appears to

include such claims.  *E.g.*, AC ¶ 14 (asserting that Hertz lost revenues due to Project delay).

Accordingly, any claim for consequential damages should be dismissed.

## I.    Hertz fails to allege a legally valid FDUTPA claim.

### A.    *Applicable Legal Standards*

Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and

unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."

Fla. Stat. § 501.204.  "The elements comprising a consumer claim for damages under FDUTPA

are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016). "To satisfy the first element, the plaintiff must show that the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Id.* at 983–94.

When a FDUTPA claim is governed by Federal Rule of Civil Procedure 8, it "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (punctuation and citations omitted). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* "The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Oliver v. Rio Acquisition Partners, LLC*, No. 2019 WL 801952, 2019 WL 801952, at *2 (S.D.N.Y. Feb. 21, 2019). "Legal conclusions, unlike facts, are not entitled to an assumption of truth." *Id.* "A complaint that offers 'labels and conclusions' or 'naked assertion[s]' without 'further factual enhancement' will not survive a motion to dismiss." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

FDUTPA claims that sound in fraud, however, are subject to the heightened pleading standards of Rule 9(b). *See In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 3920353, at *25 (S.D.N.Y. July 15, 2016) ("As [Plaintiff's] FDUTPA claim sounds in fraud . . . she must meet the heightened pleading standards of Rule 9(b)."). Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9. Rule 9(b) requires that "Plaintiffs' factual

allegations . . . reflect the who, what, when, where, and how of the alleged fraud," *Segovia v. Vitamin Shoppe, Inc.*, No. 14-CV-7061 (NSR), 2016 WL 8650462, at *8 (S.D.N.Y. Feb. 5, 2016) (quotation marks omitted), and "ordinarily requires a complaint alleging fraud to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent,'" *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017).

### B.   *Accenture's supposed failure to deliver services required by the SOW cannot support a FDUTPA claim.*

As discussed above, Hertz's FDUTPA claim has changed significantly since Hertz filed its original complaint.  Hertz's first complaint asserted that Accenture violated FDUTPA by breaching the contract and refusing to perform services supposedly required by the Phase 2 SOW absent additional fees for doing so, a course of conduct it called "extortion."  *See* Compl. ¶¶ 83–85; ECF No. 1; Hertz Pre-Filing Conference Letter, ECF No. 18.  In its pre-filing conference letter, Accenture noted that these claims were duplicative of Hertz's breach of contract claim, because the sole unfair or deceptive act they appeared to allege was that Accenture had breached the contract.  Accenture Pre-filing Conference Letter, ECF No. 10.  As Accenture noted, courts have consistently dismissed FDUTPA claims where plaintiffs asserted similar theories.  *See, e.g.*, *C&C Int'l Computers & Consultants, Inc. v. Dell Marketing, L.P.*, No. 11–60734–CIV–ZLOCH, 2011 WL 13217489, at *2 (S.D. Fla. Nov. 7, 2011) (dismissing FDUTPA claim because alleged breaches of contract "do not, in and of themselves, constitute 'deceptive or unfair practices' under FDUTPA."); *SeaMiles, LLC v. Carnival Corp.*, No. 09-23382, 2009 WL 10667772, at *11 (S.D. Fla. Nov. 23, 2009) ("Breach of contract does not constitute an unfair and deceptive trade practice."); *Jsurgical, Inc. v. Synergy Health PLC*, No. 8:18-cv-1022-T-30JSS, 2018 WL

7502042, at *3 (M.D. Fla. June 15, 2018) (granting motion to dismiss because, "to the extent Plaintiff asserts that the deceptive or unfair act was [Defendant's] nonperformance under the contract, such a theory is nothing more than a claim for breach of contract"); *Marketran, LLC v. Brooklyn Water Enterprises, Inc*., 2016 WL 8678548, at *3–4 (S.D. Fla. Aug. 31, 2016) (granting motion to dismiss because, "[t]o the extent that [Plaintiff's] FDUTPA claim is premised upon the failure of Defendants to pay for services rendered as agreed, it is essentially a breach of contract claim" (quotation marks omitted)).

The FDUTPA count of Hertz's Amended Complaint no longer contains these factual allegations at all.  Nonetheless, it does incorporate by reference the preceding allegations of the complaint and accuses Accenture of engaging in "extortionate actions" without explanation.  *See* AC ¶¶ 81–82.  To the extent Hertz continues to argue that Accenture's failure to deliver certain services Hertz thinks were required by the SOW was an unfair and deceptive practice, its FDUTPA claim is legally deficient and should be dismissed.  Moreover, the reference to "extortionate conduct" makes no sense given that the contracts involved were not for a fixed price, but instead provided that Accenture would be paid on a time and materials basis.  *See supra* at 3, 5 (citing to CSA and Phase 2 SOW).  Thus, even if there was a disagreement between the parties over what services were within the scope of the contract, Accenture was entitled to be paid for its actual time providing them.  There are therefore no circumstances under which Accenture's request for payment for the time to provide the services could be considered "extortionate."

### C. Hertz's FDUTPA claim based on alleged "misrepresentations" also fails.

Hertz's new FDUTPA theory is that Accenture made misrepresentations to Hertz, which Hertz relied on to its detriment.  *See* AC ¶¶ 83–93.  These allegations sound in fraud and are therefore subject to Rule 9(b)'s pleading standards.  *See Tyman v. Pfizer, Inc*., 16-CV-06941,

2017 WL 6988936, at *8 (S.D.N.Y. Dec. 27, 2017) ("A claim sounds in fraud if the wording and imputations of the complaint are classically associated with fraud." (quotation marks and alteration omitted)), *report and recommendation adopted*, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018); *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (allegations that registration statement was "inaccurate and misleading," that statement contained "untrue statements of material facts," and that defendants issued "materially false and misleading written statements" were "classically associated with fraud").

Hertz cites a handful of alleged misrepresentations to support its FDUTPA claims, including the statements made in connection with the summer 2016 marketing presentation as well as two others. None can support Hertz's FDUTPA Claim.

### 1. *The marketing statements fail to support a claim.*

For purpose of this motion, we assume that the statements contained in this June 2016 presentation—"We've got the skills you need to win," "800 experts," and "The best talent in the world"—as well as the representation that Accenture would put the "right team on the ground day one" are sufficiently specific to satisfy the pleading standards of Rule 9(b). Nevertheless, these allegations are legally deficient, because they fail to identify any misrepresentation at all, much less a misrepresentation that "was likely to deceive" a reasonable company in Hertz's position. *Carriuolo*, 823 F.3d at 983. In evaluating allegedly misleading statements, the Second Circuit has directed courts to look at the context of the statement and to evaluate it as a whole; the Court can and should review the underlying marketing when determining if a statement is deceptive. *See Fink v. Times Warner Cable*, 714 F.3d 739, 740-42 (2d Cir. 2017) (*per curiam*) (affirming motion to dismiss ruling in deceptive marketing case and noting need for courts to review the advertisement at issue because the allegedly deceptive words must be evaluated in context).

Here, Hertz does not assert that *any* of the marketing statements were factually untrue. The statement that Accenture had "the skills you need to win" is plainly subjective and a matter of opinion.  Moreover, it was made in the context of describing Accenture's three-pronged approach of providing strategy, design and development as a matter of company practice. *See* Ex. C to Levy Decl.  Hertz does not allege that Accenture does not have skills in each of these areas.  The reference to "800 experts" and the "best talent" similarly are on a page providing general background information about Accenture.  Again, words like "experts" and "best talent" are plainly matters of opinion.  Moreover, Hertz does not allege that Accenture does not have 800 experts (among its hundreds of thousands of employees) or that it does not have some of the "best talent" in the world.  These phrases certainly do not amount to a guarantee that every Accenture employee is an expert at every technology.  Indeed, this page does not even relate to specific staffing for the Project, as is clear from the discussion on the page about Accenture's "300 clients" and its list of myriad office locations across the globe.  Similarly, to the extent Accenture represented in its submission that it would "put the right team on the ground day one," Hertz does not allege that Accenture in fact put the wrong team on the ground on day one.

Rather, Hertz's theory is that these general marketing statements from a presentation Accenture provided Hertz in the summer of 2016, prior to Phase 1 of the Project, were false because in 2017 (after Hertz and Accenture had entered into numerous SOWs and Letters of Intent),[5] when Accenture personnel were working on Phase 2 of the project, some of them allegedly "were not experts" and were not as adept as Hertz believes they should have been with the use of Angular code for front-end development, Javascript, or AEM code.  AC ¶¶ 84, 86–88.

---

[5] AC ¶ 28 (explaining that for Phase 1 alone, there were "four statements of work and letters of intent").

But Hertz identifies no statements where Accenture made specific, factual representations regarding the knowledge and experience of its front-end developers, their use of Javascript or Angular coding, or the experience of its AEM coders.  If Hertz's distortion of Accenture's generalized marketing statements in 2016 could support a FDUTPA claim merely because problems arose many months later, then every company that ever purports to have the ability to perform a project would violate FDUTPA if the project went awry.

These generalized marketing statements are no more than non-actionable puffery.  As noted, to prevail on a FDUTPA claim, a plaintiff must allege that a defendant's conduct is "likely to deceive a consumer acting reasonably in the same circumstances."  *Carriuolo*, 823 F.3d at 983.  The plaintiff's level of sophistication is relevant to this inquiry.  *See e.g.*, *James D. Hinson Elec. Contracting Co. v. BellSouth Telecommunications, Inc.*, 275 F.R.D. 638, 645 (M.D. Fla. 2011) (knowledge and sophistication of plaintiff is relevant to reasonableness of reliance).  "In distinguishing actionable representations from non-actionable 'puffery' under FDUTPA, courts in this district have looked to whether the claims are specific and measurable, as opposed to vague and highly subjective." *Thompson v. Procter & Gamble Co.*, No. 18-CV-60107, 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018).  The statements that Hertz allegedly relied upon in entering into the Agreement are "vague and highly speculative."  *E.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *26 (in FDUTPA context, "general statements" regarding "quality" are "inactionable puffery" insufficient to "cross the Rule 9(b) line"); *Barilli v. Sky Solar Holdings, Ltd.*, No. 17 CV 4572-LTS-DCF2019, WL 2250445, at *11 (S.D.N.Y. May 23, 2019) ("general positive statements" about defendant's "professional history" and "abilities" are "at most non-actionable puffery"); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *7-8 (S.D.N.Y. Feb. 25, 2009) (statements that management team was "strong,"

"experienced," and "capable" are non-actionable puffery); *see also Greenberg v. Chrust*, 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003) ("Courts have found parties' assessment of their own abilities and successes to be non-actionable statements of opinion when rendered in good faith."). Simply put, no reasonable person, much less a Fortune 500 company planning a multi-million dollar redesign of its digital platforms, could interpret a statement in a marketing presentation that a company had "the best talent" and the "the skills you need to win" as a factual assertion that everyone who ever worked on the Project would perform their work flawlessly. *See Vorst v. TBC Retail Grp., Inc*., No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (granting motion to dismiss FDUTPA claim where no deceptive statement and noting "[t]his standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer") (quotation omitted).

Hertz's allegations are rendered even more implausible by the parties' heavily negotiated contractual relationship. "[A] plaintiff has no FDUTPA claim where he signed a contract whose terms expressly contradict any misrepresentations on which he relied." *Zlotnick v. Premier Sales Grp., Inc.*, 431 F. Supp. 2d 1290, 1295 (S.D. Fla. 2006), *aff'd*, 480 F.3d 1281 (11th Cir. 2007); *see also Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003) ("Plaintiff's signing of a contract whose terms expressly contradicted the alleged misrepresentations on which he relied bars him from seeking relief pursuant to FDUTPA, as he acted unreasonably.").[6] Similarly, under "FDUTPA, a cause of action cannot exist for behavior that complies with the

---

[6] On this same point, *see also Kennedy v. Deschenes*, No. 17-60110-CIV, 2017 WL 2223050, at *5 (S.D. Fla. May 19, 2017); *Vital Pharm., Inc. v. Balboa Capital Corp.*, No. 14-62469-CIV, 2016 WL 4479370, at *7 (S.D. Fla. Aug. 25, 2016).

terms of a contract." *Amar Shakti Enterprises, LLC v. Wyndham Worldwide, Inc.*, No. 6:10-CV-1857-ORL-31, 2011 WL 3687855, at *3 (M.D. Fla. Aug. 22, 2011).

The CSA, which was incorporated by reference into the SOW, Levy Decl., Ex. B (SOW) at 1, expressly reserved to Accenture the right to make staffing decisions: "Accenture reserves the right to determine which personnel shall be assigned to perform Services, and to replace or reassign such personnel during the term of this Agreement." CSA ¶ 8.1. The CSA further contained express disclaimers that "THIS SECTION . . . IS ACCENTURE'S ONLY EXPRESS WARRANTY CONCERNING THE SERVICES . . . AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER . . . REPRESENTATIONS." CSA ¶ 6. It would not be reasonable for a sophisticated business in Hertz's position to rely on generalized marketing materials about Accenture's global workforce, when Hertz agreed that when it came to this specific Project, Accenture had the right under the contract to determine all staffing, including to replace staff at will, with no agreement as to the minimum levels of experience of any particular staff member. *See Simony v. Fifth Third Mortg. Co.*, No. 2:14-CV-387-FTM-29, 2014 WL 5420796, at *4, *8 (M.D. Fla. Oct. 22, 2014) (granting motion to dismiss FDUTPA claim based on alleged misrepresentation concerning value of property where contract expressly stated "neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property").

Finally, Hertz appears to be asserting that these four vague statements regarding the ability of Accenture's employees in its 2016 pitch presentation could dupe a reasonable business in Hertz's position into hiring Accenture. If anything runs afoul of *Iqbal*'s requirement that a complaint's factual allegations must be "plausible," surely it is this. This is particularly true

given that the parties had been in a contractual relationship since 2004 and had been engaged in Phase 1 of this project for many months before signing the new SOW for Phase 2 in September 2017. Unsurprisingly, Florida courts have dismissed FDUTPA claims similarly devoid of any factual allegations that would make them remotely plausible. *See, e.g.*, *C&C Int'l Computers & Consultants, Inc.*, 2011WL 13217489 at *2 (dismissing FDUTPA claim where plaintiff "offers no facts to support" its claim that defendant was "attempting to deceive plaintiff as to its contractual rights or remedies").

For all these reasons, the marketing allegations in paragraphs 83–88 cannot support a legally valid FDUTPA claim. No reasonable person, much less a multi-billion-dollar company hiring a vendor for a multi-million-dollar project could treat these as specific and measurable assertions of fact rather than vague generalities. And Hertz's claim that a reasonable business would rely on these specific statements in hiring Accenture is implausible.

### 2. *Hertz's remaining FDUTPA allegations do not satisfy Rule 9(b).*

Hertz's FUDPTA claim also alleges two other misrepresentations by Accenture to support its claims. Specifically, Hertz claims that Accenture "led Hertz to understand that its developers had the required expertise to use RAPID [a technology on the project] properly," which was "false." AC ¶ 89. Hertz also asserts that Accenture "misrepresented" the extent of its testing of its code because certain lines of its code were "comment[ed] out," which led to them being ignored during testing. AC ¶ 90. Neither of these allegations satisfies Rule 9(b), because they do not provide the "who, what, when, where, and how of the alleged fraud" as required by Rule 9(b). *Segovia*, 2016 WL 8650462, at *8 (quotation marks omitted).

First, Hertz alleges that Accenture "led it to believe" Accenture's staff had the "expertise" to use a technology on the project known as RAPID. AC ¶ 89. But Hertz does not identify who at Accenture made these representations, when Accenture made these statements, in

what context, or most importantly of all, precisely *how* Accenture "led Hertz to understand" that its staff had this expertise.  Without such information, Hertz's Amended Complaint fails to "provide [Accenture] with fair notice of [Hertz's] claim," one of the most important purposes of Rule 9(b).  *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25–26 (2d Cir. 2016).  Further, Hertz does not explain how the alleged misrepresentation was false.  Hertz merely asserts that Accenture stated that it "spent a good deal of time" "fighting through the integration of RAPID" into Hertz environment.  AC ¶ 89.  Even someone with experience can face integration hurdles.

The same is true as to Hertz's allegations regarding testing.  *See* AC ¶ 90.  The redesign of Hertz's digital platforms involved an enormous volume of code, written by Accenture developers (and then tested) over the course of more than a year.  Hertz does not identify a single line of code that was supposedly "commented out," AC ¶ 90, let along the statements Accenture made regarding the extent of its testing that were allegedly deceptive.  Hertz does not even identify in vague terms when and where the supposedly deceptive statements regarding the extent of Accenture's testing occurred.  In short, nothing about Hertz's claims concerning this "commented-out" code would allow Accenture to pin-point when, how, or where these alleged misrepresentations occurred and to prepare its defense accordingly.  *See United States ex rel. Ladas*, 824 F.3d at 25–26.  Moreover, this claim is particularly implausible given Hertz's extensive role in testing under the Phase 2 SOW.

Finally, Hertz includes in its FDUTPA count the blanket allegation that these paragraphs "provide some examples of Accenture's unfair and deceptive conduct; they are not exhaustive." AC ¶ 91.  But these sorts of conclusory allegations are precisely what Rule 9(b) prohibits in order to "safeguard a defendant's reputation from improvident charges of wrongdoing." *United*

*States ex rel. Ladas*, 824 F.3d at 25.  Indeed, courts regularly recognize that such vague and content-free allegations cannot support a claim even under the more relaxed pleading standards of Rule 8. *See, e.g.*, *C&C Int'l Computers & Consultants, Inc.*, 2011WL 13217489 at *2 (dismissing FDUTPA claim where plaintiff "offers no facts to support" its claim that defendant was "attempting to deceive plaintiff as to its contractual rights or remedies"). The Court should do so here.

## II.    Hertz is barred from recovering consequential damages.

In its Amended Complaint, Hertz appears to bring a claim for consequential damages, including lost revenues allegedly due to project delays:

> [S]imply completing the project – which required identifying and remediating the defects in Accenture's work and the development of functionality that Accenture was supposed to deliver but could not – required Hertz to expend more than $10 million in additional fees.  ***Worse, Accenture's failure to timely deliver the website and apps for which it was so generously paid has caused Hertz to lose millions of dollars in revenue in a tremendously competitive industry***.  Hertz now brings this action to recover the fees that it paid to Accenture and the damages that it has suffered and continues to suffer as a result of Accenture's breaches.

AC ¶¶ 14-15 (emphasis added).

Hertz's claim for "millions of dollars of lost revenue," *i.e.*, consequential damages, is straightforwardly barred.  Hertz may not seek consequential damages under its FDUTPA count, as Florida law limits recovery under FDUTPA to "actual damages," and bars recovery for lost profits under that Act.  Likewise, Hertz cannot seek such consequential damages under its breach of contract claim, as Hertz in the CSA agreed to a damages waiver in which it promised not to seek consequential damages.

### A.    *Hertz may not recover consequential damages under FDUTPA*

FDUTPA does not apply to "[a] claim for damage to property other than the property that is the subject of the consumer transaction."  Fla. Stat. § 501.212.  As a result, a party may not

19

bring a claim under FDUTPA for "consequential damages in the form of lost profits."   *HRCC,*

*Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 815 (11th Cir. 2017).  Instead, under

FDUTPA, a party may only recover "actual damages," which is defined to mean:

> The difference in the market value of the product or service in the condition in
> which it was delivered and its market value in the condition in which it should have
> been delivered according to the contract of the parties.

*Id.*; *see also Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062-CIV, 2016

WL 4256916, at *6 (S.D. Fla. May 16, 2016) (noting "consequential damages, including lost

profits, cannot be recovered under FDUTPA" and collecting cases on same).  As a result, Hertz

cannot seek its lost profits pursuant to FDUTPA, because "lost profits, the quintessential example

of consequential damages, are not permitted."  *ADT LLC v. Vivint, Inc.*, No. 17-CV-80432, 2017

WL 5640725, at *5 (S.D. Fla. Aug. 3, 2017).

The only amount Hertz may seek to recover is the "difference in the market value of a

product or service in the condition in which it was delivered and its market value in the condition

in which it should have been delivered according to the contract of the parties."  *ADT*, 2017 WL

5640725, at *5.  Respectfully, the Court should dismiss any claim by Hertz for consequential

damages, including lost profits, under FDUTPA.

### B.  *Consequential damages are also barred by the CSA.*

Hertz also cannot recover consequential damages in connection with its breach of

contract claim.  The CSA provides that Accenture can only be liable for direct damages and in no

event can it be held liable for any "consequential, incidental, indirect, [or] special" damages and

specifically states that this waiver shall foreclose any claim for "business disruption, lost

business, lost profits, or lost savings."  CSA ¶ 9.2.  "New York courts have routinely enforced

liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses

as a means of allocating economic risk in the event that a contract is not fully performed."

*Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016); *see also Mom's Bagels of New York, Inc. v. Sig Greenebaum, Inc.*, 164 A.D.2d 820, 822 (N.Y. 1990) ("We have long held that parties to a commercial contract, absent any question of unconscionability, may agree to limit the seller's liability for damages.  That is precisely what the parties hereto contracted to do."); *Unilever United States, Inc. v. Johnson Controls, Inc.*, No. 16-CV-01849, 2017 WL 622209, at *3 (N.D. Ill. Feb. 15, 2017) (applying New York law and on motion to dismiss determining whether claimed damages were bared by consequential damages waiver); *Sterling Fed. Bank, F.S.B. v. Credit Suisse First Bos. Corp.*, No. 07-C-2922, 2008 WL 4924926, at *12 (N.D. Ill. Nov. 14, 2008) ("New York courts enforce contractual limitations on remedies.").[7]

Any claim by Hertz for consequential damages, including lost revenues allegedly occasioned by delays on the Project, *see* AC ¶ 14, is barred by the contractual damages waiver. Under New York law—which governs the contracts at issue here, direct damages are "those which are the natural and probable consequence of the breach." *Am. List Corp. v. U.S. News and World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989).  By contrast, lost profits constitute consequential damages when the "non-breaching party suffers loss of profits on collateral business arrangements."  *In re Lehman Bros. Holdings Inc.*, 544 B.R. 62, 73 (Bankr. S.D.N.Y. 2015) (finding damages waiver barred lost profits claim).  Such a limitation is appropriate at the motion to dismiss stage when the terms of an agreement between the parties bar recovery of a form of damages alleged in a complaint.  *M Sports Prods. v. Pay-Per-View Network, Inc.*, 1998 WL 19998, at *2 (S.D.N.Y. Jan. 20, 1998) (granting motion to dismiss consequential damages

---

[7] As discussed *supra* at p.3, the contracts—including the damages waiver—are governed by New York law.

claim where "the Agreement bars consequential damages on its face"); *Streamline Capital,*

*L.L.C. v. Hartford Cas. Ins. Co.*, No. 02 CIV. 8123 (NRB), 2003 WL 22004888, at *6 (S.D.N.Y.

Aug. 25, 2003) (granting motion to dismiss consequential damages because, in part, contract

contained damages waiver); *see also Mayor v. Jean Philippe Fragrances, Inc.*, No. 92 CIV. 6217

(LBS), 1994 WL 9684, at *5 (S.D.N.Y. Jan. 10, 1994) ("[W]e apply the express terms of the

Agreement and dismiss [Plaintiff's] claim for consequential damages.").  Put another way,

Accenture and Hertz, "sophisticated parties represented by sophisticated counsel, unambiguously

provided the limit of recovery in the event of breach, and [the Court] may not re-write how the

parties defined their rights and obligations, allocated their risks, and limited their liabilities and

rights of recovery."  *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002).[8]

   Accordingly, the Court should dismiss any claim by Hertz for consequential damages.

Doing so now will narrow the case and lead to more focused and efficient discovery—saving

both parties the expense of discovery into issues related to unrecoverable damages—and may, in

helping the parties develop their theories in discovery, promote resolution of the case.

---

[8] To the extent that Hertz claims (in addition to its lost profits) to be entitled to both the fees it paid Accenture and the cost of "identifying and remediating the defects in Accenture's work and the development of functionality that Accenture was supposed to deliver but could not," AC ¶ 14, that outcome is foreclosed by New York law.  Instead, Hertz would be entitled to—at most— the cost of completing the work, less Accenture's outstanding unpaid fees.  Under New York law governing breach of contract actions, while "the [a buyer] is entitled to be made whole and should recover the cost of completing the work that was the subject of the contract and correcting the defects in the [seller's] work . . . the [seller] may set off, against the defendant's recovery, the unpaid balance of what was due to it under the contract."  *Metro. Switch Bd. Mfg. Co. v. B & G Elec. Contractors, Div. of B & G Indus., Inc.*, 96 A.D.3d 725, 726, (2d Dep't 2012); *Marino v. Lewis*, 792 N.Y.S.2d 572, 573 (2d Dep't 2005) ("Since the complaint alleged that the amount needed to remedy the work performed by the defendant was $5,000, the Supreme Court correctly concluded that she was not also entitled to recover the $17,000 previously paid to him on the contract."); *see also* 28A N.Y. Prac., Contract Law § 22:34 ("When a party fails or wrongfully refuses to finish a job for which it was retained, the non-breaching party may recover any additional amount above the contract price that it cost to complete the job.").

## CONCLUSION

For the reasons discussed above, Accenture respectfully requests that the Court enter an order dismissing the FDUTPA claim and dismissing any claim by Hertz for the recovery of consequential damages.

Respectfully submitted,

**ACCENTURE LLP**

 /s/ James H. Bicks
James H. Bicks (JB2930)
Kim E. Rinehart (admitted pro hac vice)
David R. Roth (admitted pro hac vice)
Wiggin and Dana LLP
437 Madison Avenue
35th Floor
New York, New York 10022
Phone: 203.363.7622
Fax: 212.551.2888
E-mail: jbicks@wiggin.com

*Attorneys for Accenture LLP*

23