

Wiggin and Dana LLP
437 Madison Avenue
35th Floor
New York, New York
10022
www.wiggin.com

James H. Bicks
203.363.7622
212.551.2888 fax
jbicks@wiggin.com

October 21, 2019

**VIA ECF**
The Honorable William H. Pauley III
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:     The Hertz Corporation v. Accenture LLP, No. 19cv3508 (WHP)

Dear Judge Pauley:

Pursuant to Your Honor's Individual Rule III.A.iv Defendant Accenture LLP ("Accenture") and Plaintiff The Hertz Corporation ("Hertz") write jointly to address a discovery dispute that Accenture wishes to raise with the Court regarding Hertz's designation of certain discovery materials as Attorneys' Eyes Only ("AEO").

## 1.       Summary of the Dispute

This case concerns Hertz's effort to remake its website and mobile applications, a project the parties generally referred to as the Digital C2C Project. Accenture assisted Hertz on this project from 2016 until the end of June 2018. At that time, Accenture stopped working on the project and Hertz hired another vendor, IBM, to assess Accenture's work and to assist Hertz in launching its new website and mobile apps. Hertz alleges that Accenture's work for Hertz was deficient in various ways, *see* Am. Compl. ¶¶ 1–13, 22–65, 69–79, and it seeks as damages the fees it paid IBM, allegedly to remediate Accenture's work, *id.* ¶¶ 14–15, 67, 80.

Throughout the project, Hertz used two project-management platforms, known as Confluence and JIRA. The first, Confluence, is a "wiki"-style repository for key project documents, such as architecture specifications and work plans. The second, JIRA, is an issue tracker used to identify bugs or defects in the website and apps and to track the steps taken to address those issues. Hertz owns and controls the relevant pages on these platforms. Hertz has provided Accenture with access to the Confluence and JIRA pages used by Accenture for the Accenture phase of the project (through June 2018). The present discovery dispute concerns separate Confluence and JIRA pages used by Hertz and IBM to manage the IBM phase of the project. These are active, live workspaces that are still in use by Hertz and IBM, as the IBM phase of the project is not yet complete.

On September 9, Hertz agreed to give counsel for Accenture access to these Hertz/IBM Confluence and JIRA pages. However, Hertz designated these pages and all of the documents

October 21, 2019
Page 2

contained on them AEO. Accenture understands that these pages collectively contain tens if not hundreds of thousands of documents.

Regarding the designation of materials AEO, the Protective Order provides:

> [C]ounsel for any party may designate any information or document as "Highly Confidential – Attorneys' Eyes Only" if counsel determines, in good faith, that it contains or reflects information that is extremely confidential and/or sensitive in nature and reasonably believes that its disclosure is likely to cause economic harm or significant competitive disadvantage to the designating party. . . . The Parties agree that the following information, if non-public, shall be presumed to merit the "Highly Confidential – Attorneys' Eyes Only" designation: trade secrets, pricing information, financial data, sales or marketing forecasts or plans, business plans, sales or marketing strategy, product development information, engineering documents, testing documents, employee information, and other non-public information of similar competitive and business sensitivity.

Protective Order ¶ 2. The Protective Order requires parties to "take care to limit any [confidentiality] designation to specific material that qualifies under the appropriate standards in this Protective Order" and "prohibit[s]" "[m]ass, indiscriminate, or routinized designations . . . except as provided specifically in this Order or any federal statute or regulation." *Id.* ¶ 12.

Given Hertz's AEO designation, only attorneys and experts for Accenture are permitted to view these pages or any documents stored on them. *See* Protective Order ¶ 15 (restricting who can access materials designated AEO). This means that the Accenture developers who worked on the Hertz project are prohibited from reviewing these pages or the documents contained on them or conferring with Accenture's attorneys or experts regarding any information learned from these pages or documents.

Although Accenture disputed that Hertz's designation of these pages as AEO was permitted by the Protective Order, it made a compromise proposal that Hertz give access to these pages to a group of approximately ten Accenture employees who were responsible for key areas of Accenture's work on the Hertz project so that they could assist Accenture's attorneys and experts in understanding IBM's assessment of their work and the details of IBM's revisions to Accenture's work. Under Accenture's proposal, these pages and the documents on them would otherwise remain AEO and could not be shared with any other Accenture employees without Hertz's approval.

Counsel for the parties met and conferred regarding the production of these pages on September 24. During that conference, Hertz confirmed that it would not agree to provide access to these pages other than under an AEO designation. *See* Exhibit A at 5–6 (Letter from J. Bicks to E. Naughton, Sept. 25, 2019); Exhibit B at 2 (Letter from R. Lecaroz to J. Bicks, Sept., 26, 2019). The parties subsequently exchanged further letters regarding these issues. *See* Exhibit C at 2–3 (Letter from J. Bicks to R. Lecaroz, Oct. 1, 2019); Exhibit D at 1–2 (Letter from R. Lecaroz to J. Bicks, Oct. 2, 2019); Exhibit E at 2–3 (Letter from J. Bicks to R. Lecaroz, Oct. 3, 2019); Exhibit

October 21, 2019
Page 3

F (Email from K. Dorso to D. Roth, Oct. 11, 2019). In these letters and conferences, Hertz explained that it was deferring to IBM's instruction that Hertz maintain the AEO designation for these live pages and the documents stored on them. *See* Exhibit B at 2; Exhibit D at 2–3; Exhibit F. Hertz also explained that IBM was still in the process of completing its review of the contents of the workspaces and had requested additional time to respond to Accenture's request to de-designate those pages as AEO. *See* Exhibit F. Hertz has provided no deadline when this process will be completed. The parties have been unable to resolve their dispute through discussions.

**2.      Accenture's Position**

Accenture believes that Hertz's designation of the Hertz/IBM Confluence and JIRA workspaces and all the documents stored on them as AEO is contrary to the Protective Order and is improper for several reasons.

First, as Hertz has never disputed, the Confluence and JIRA workspaces contain a large volume of documents that are critical to Accenture's defense and that do not contain any information that would warrant designating the documents AEO. *See* Exhibit A at 5. Even though these workspaces indisputably contain critical non-AEO documents, Hertz has failed to review each document contained in these workspaces to make individualized designations as required by the Protective Order. Instead, it has mass designated *all* of the tens of thousands of documents in these workspaces as AEO without reviewing them at all. *See* Exhibit E at 2. This is contrary to Paragraph 12 of the Protective Order, which requires designating parties "to limit any [confidentiality] designation to specific material that qualifies under the appropriate standards in this Protective Order" and prohibits "[m]ass, indiscriminate, or routinized designations." If anything counts as a "mass" designation of documents, surely it is designating AEO tens of thousands of documents that Hertz has never even reviewed.

Hertz claims its mass designation of these workspaces and their documents is appropriate because these workspaces are "live" (i.e., still being used). But Hertz could easily make a copy of these workspaces as they exist today and provide access to that copy, something Hertz has already done for other workspaces. Hertz also suggests that it is not possible to individually review and produce the documents on these workspaces. But several methods exist to download and produce the contents of these workspaces as individualized documents, including simply telling Accenture which documents or portions of the workspaces are AEO and allowing Accenture's attorneys to download the non-AEO documents. As Accenture explained to Hertz during the September 24 meet and confer, Accenture is not insisting on being given native access to these workspaces and is willing to consider any reasonable proposal short of designating the entire workspaces and all their documents AEO based on IBM's objection. Despite its repeated promises that it would make a proposal along these lines, Hertz has failed to do so. Hertz simply does not want to incur the time and expense to review and individually designate the tens of thousands of documents on these workspaces. Hertz brought this suit. Its desire to save costs is no excuse for mass designating thousands of documents contrary to the Protective Order it agreed to.

October 21, 2019
Page 4

Second, Hertz is designating these workspaces and their documents AEO at the direction of a third party, IBM, who Hertz has represented is requiring Hertz to maintain the AEO designation. But the Protective Order explicitly requires *designating parties*, here Hertz, to make a good faith determination that particular documents contain information warranting an AEO designation. Protective Order ¶ 2. Nothing in the Protective Order allows Hertz to outsource the review and designation of documents to a third party, IBM.

Third, Hertz is not designating these documents AEO because it believes these workspaces contain information *about Hertz* that, if disclosed to Accenture, would cause *Hertz* commercial or competitive harm. Instead, Hertz is designating these documents AEO because a third party, IBM, thinks disclosing these documents to Accenture may cause IBM commercial harm. *See* Exhibit D at 1–2. Accenture doubts that the sort of documents kept in these workspaces could pose any legitimate competitive harm to IBM: They are project-management workspaces containing documents about IBM's work with Hertz on the project; it is not a repository of financial records or trade secrets. Indeed, IBM has willingly posted these documents on project management platforms that belong to Hertz and that Hertz controls. Regardless, nothing in the Protective Order allows Hertz to give a non-party veto power over Hertz's production of documents in Hertz's possession. *See* Exhibit E at 2–3.

Finally, it is grossly unfair for Hertz to allege that Accenture's code was deficient and to seek millions in dollars of damages, but then to shield review of the documents regarding those matters based on the purported confidentiality concerns of a third party. *Id.* Hertz brought this suit and placed directly at issue the details of IBM's work on Accenture's code: It alleges that Accenture's code was deficient, that IBM identified defects in the code, that IBM charged Hertz millions of dollars to correct these alleged deficiencies, and it seeks these fees paid to IBM as damages. There is simply no way Accenture can defend against these claims if it cannot consult with the Accenture employees who created Accenture's code in the first place and whose work IBM and Hertz allegedly assessed and modified. IBM is apparently aware of this dispute, and if IBM had legitimate concerns about this discovery, it certainly would have the resources and ability to raise them with the Court. It has not done so.

Although Accenture believes that any confidentiality interest in these workspaces and their documents is adequately protected by designating them Confidential, Accenture has tried to balance IBM's purported concerns with Accenture's need to review these documents with its employees by proposing that Hertz give access to these pages to a group of approximately 10 Accenture employees who were directly responsible for core areas of Accenture's work on the project. These employees all work in a technical, rather than a competitive decision-making capacity, and they would all agree to enter a written undertaking to be bound by the Protective Order, including its provisions requiring them not to disclose any information learned in this suit to others or to use it for purposes other than assisting in Accenture's defense of Hertz's claims. This proposal is similar to how the parties have agreed to handle the confidentiality of the source code used for Hertz's website and mobile apps: Hertz agreed to make this code (both as delivered by Accenture and as subsequently modified by Hertz and IBM) available to a group of key Accenture developers who worked on the Hertz project so that they could review the code, consult with Accenture's attorneys and experts, and assist in Accenture's defense of Hertz's

October 21, 2019
Page 5

claims. It makes no sense for these employees to be able to access, analyze, and discuss the live source code for Hertz's website and mobile apps but not to be able to view or discuss documents related to the development of that source code.

Hertz has rejected this compromise proposal and failed to provide any alternative besides producing all of these workspaces and their documents AEO. Accenture respectfully requests that the Court direct Hertz to give access to these Confluence and JIRA workspaces and the documents maintained on them according to Accenture's proposal.

**3.      Hertz's Position**

The Hertz/IBM Confluence and JIRA workspaces are properly designated as AEO for several reasons.

As an initial matter, the IBM Confluence and JIRA workspaces are still live, active workspaces that the Hertz and IBM teams continue to work in as they complete the Digital C2C Project. Moreover, the platforms are not capable of being downloaded wholesale, processed as individual documents, tagged with an individual confidentiality tag, and provided to Accenture through part of the normal document review and production process. To the extent that the workspaces may contain a mix of AEO and non-AEO documents, it is neither possible for Hertz to produce individually Bates numbered and confidentiality tagged documents, nor for Hertz to segregate access to only AEO documents without incurring substantial cost and disrupting its ongoing multi-million dollar project. While Accenture asserts – without any supporting detail – that there are "several methods" for doing so, it has never offered a technical solution to the problem. When Hertz investigated this possibility, it was informed by those with technical expertise that the only process available for such an endeavor could take ***months*** to complete, with no guarantees of success, and would strip the documents of the metadata that identified the links between the documents. During the parties' initial discovery conferences, Hertz's counsel provided this information to Accenture's counsel, and counsel agreed that Hertz would produce the workspaces in their native format, in order to maintain the metadata, but also because the schedule of this case did not permit months for production.

Second, contrary to Accenture's assertions, the Protective Order protects precisely the type of information contained within these live pages. These workspaces include source materials for Hertz's live app and in-development website, which have been designated and treated as AEO. Moreover, IBM has asserted a substantial confidentiality interest in these portions of the workspaces because they contain IBM's competitively sensitive information, including its proprietary methodologies and other intellectual property – in a space in which Accenture directly competes with IBM. Hertz is not using IBM as a shield to prevent the broad disclosure of these documents to the employee of a direct competitor, nor is it giving IBM "veto power" over Hertz's production of these workspaces (indeed, Hertz has already produced them). Rather, as Hertz has repeatedly explained to Accenture, Hertz is contractually obligated to protect IBM's confidential information, including its work product. To provide access to IBM's confidential information without the requisite "AEO" protection, in breach of Hertz's contractual duties to

October 21, 2019
Page 6

IBM, would subject Hertz, the designating party, to "economic harm." The designation of these spaces as "AEO" falls squarely within the purpose of such a designation in the Protective Order.

Accenture argues that it is somehow "unfair" not to allow Accenture personnel to access these workspaces, but that argument proves too much. While it might be helpful if Accenture employees could review IBM's work product, that is true for virtually all AEO information. As discussed above, Hertz has already provided read-only access to these workspaces to Accenture's outside counsel, the terms of the Protective Order also allow outside experts to access "AEO" materials (assuming that they have executed the appropriate undertakings). Accenture's counsel and its technical experts should be more than capable of evaluating Hertz's claims that Accenture delivered deficient code. Accenture has not explained why this expert assistance is insufficient to allow it to defend Hertz's claims; it offers only conclusory complaints that it is "unfair."

Finally, although Hertz has agreed to provide access to its IBM-modified source code to a limited number of Accenture developers that worked on the project, that access is provided under entirely different circumstances than what Accenture is seeking here. Those few Accenture personnel who are allowed to review Hertz's source code may do so only under strict protocols that are designed to protect the confidentiality and integrity of the code that powers Hertz's digital assets. That review is conducted only on stand-alone computers, not connected to any network, that are located in Brown Rudnick's offices. The reviewers are required to sign in and out, they cannot bring their phones or other devices into the room where the computers are located, and they can make only a limited number of printouts. Here, Accenture demands that its employees – the very developers who would most benefit from analyzing IBM's methodologies – have unfettered, private access to Hertz and IBM's commercially sensitive work product.

Accordingly, Hertz requests that the Court uphold Hertz's designation of these active workspaces as AEO.

                          *        *        *        *        *

The parties appreciate the Court's resolution of this issue. They will make themselves available on short notice to discuss these issues with the Court, either in person or through a telephonic conference.

October 21, 2019
Page 7

Respectfully submitted,

Dated: October 21, 2019

By: /s/ Edward J. Naughton                     /s/ James H. Bicks
Edward J. Naughton (*pro hac vice*)            James H. Bicks (JB2930)
Rebecca M. Lecaroz (*pro hac vice*)            Sapna W. Palla (SP9009)
Kyle P. Dorso (*pro hac vice*)                 Kim E. Rinehart (admitted pro hac vice)
One Financial Center                           David R. Roth (admitted pro hac vice)
Boston, MA 02111                               Wiggin and Dana LLP
Telephone: (617) 856-8200                      437 Madison Avenue
Facsimile: (617) 856-8201                      35th Floor
enaughton@brownrudnick.com                     New York, New York 10022
rlecaroz@brownrudnick.com                      Phone: 203.363.7622
kdorso@brownrudnick.com                        Fax: 212.551.2888
                                               jbicks@wiggin.com
-and-                                          spalla@wiggin.com
                                               krinehart@wiggin.com
D. Cameron Moxley                              droth@wiggin.com
Seven Times Square
New York, New York 10036                       *Counsel for Defendant Accenture LLP*
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
cmoxley@brownrudnick.com

*Counsel for Plaintiff The Hertz Corporation*