UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
THE HERTZ CORPORATION,

          Plaintiff,

    -against-

ACCENTURE LLP,

          Defendant.
-----------------------------------------------------------

19cv3508

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

        Plaintiff the Hertz Corporation ("Hertz") brings this action against Defendant Accenture LLP ("Accenture") for breach of contract and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Accenture moves to dismiss Hertz's FDUTPA claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and also seeks to dismiss any claims by Hertz for consequential damages, including lost profits. For the following reasons, Accenture's motion is granted in part and denied in part.

## BACKGROUND

        The allegations in the Complaint are presumed true on this motion. In 2016, Hertz decided to undergo a digital makeover by developing a new website and a suite of complementary mobile applications for its vehicle rental brands (the "Project"). (Corrected First Am. Compl., ECF No. 26 ("Compl."), ¶ 23.) Since Hertz did not have the necessary expertise, it solicited proposals from technology service firms, including Accenture. Ultimately, Hertz hired Accenture following a one-day marketing presentation, in which Accenture touted its world-class expertise in website and mobile application development. (Compl. ¶¶ 26, 83.) The presentation contained slides stating that Accenture's staff consisted of "800 [e]xperts" who comprised "[t]he

1

best talent in the world." (Compl. ¶ 83.) The presentation also stated "[w]e've got the skills you need to win" and that Accenture would "put the right team on the ground [from] day one." (Compl. ¶ 83.)

The Project was to be conducted in phases, and the services and deliverables for each phase were, in turn, specified in letters of intent ("LOIs") and corresponding statements of work ("SOWs"). (Compl. ¶ 27.) The LOIs and SOWs were governed by a Consulting Services Agreement between Hertz and Accenture that had been in place since 2004. (Compl. ¶¶ 25, 27.) Between August and November 2016, Accenture completed work on Phase 1, which involved various planning services and the development of a "Solution Blueprint" describing the processes and technologies needed to complete the Project. (Compl. ¶ 28.) On January 30, 2017, Accenture and Hertz entered Phase 2 of the Project pursuant to an LOI that required Accenture to actually design, build, test, and deploy the website and mobile applications. (Compl. ¶ 30.) Accenture committed to a December 2017 "go-live" date. (Compl. ¶ 33.)

Phase 2, however, was wrought with difficulties. By September 2017, Accenture informed Hertz that it would not be able to meet the promised December 2017 go-live date and requested an extension until January 2018. (Compl. ¶ 35.) Accenture later requested a second extension until April 2018. (Compl. ¶ 35.) Many of Accenture's problems in completing the Project were allegedly related to misrepresentations about the expertise of Accenture's staff. Indeed, Hertz contends that Accenture's developers were not the promised experts. (Compl. ¶ 84.) Instead, they were inexperienced and unfamiliar with the technologies that Accenture recommended to Hertz for the Project. (Compl. ¶ 84.) This inexperience manifested itself in Accenture's poor website and mobile application coding. For example, Accenture struggled to develop an "integration layer" that allowed customer-facing code to communicate with Hertz's

back-end technological systems, such as Hertz's reservations system and rewards program. (Compl. ¶ 36.) Similarly, Accenture's Java code "displayed poor logic" and was "difficult to maintain." (Compl. ¶ 40.)

Accenture also struggled to implement so-called "RAPID" technology, which was intended to streamline the development of portions of Hertz's new website. (Compl. ¶ 41.) Accenture recommended this technology to Hertz, and—in the Solution Blueprint—Accenture explained that its implementation required expertise. (Compl. ¶ 89.) Accenture represented that its developers had that expertise. (Compl. ¶ 89.) As such, Hertz followed Accenture's recommendation and acquired licenses for the technology. Ultimately, however, Accenture failed to implement RAPID, and it later acknowledged that it "spent a good deal of time" trying to "fight[] through [the] integration of RAPID" into the Project. (Compl. ¶ 89.)

Hertz hired a new technology services provider for the Project in June 2018 and terminated Accenture. (Compl. ¶ 63.) After Hertz removed Accenture from the Project, Hertz learned that Accenture had misrepresented the extent of its code testing. (Compl. ¶ 90.) According to Hertz, Accenture's developers merely performed select tests, which tended to conceal Accenture's poor work. (Compl. ¶ 64.) Specifically, several portions of the code were "commented-out," meaning that they were marked as "explanatory comments" rather than actual programming code. Commented-out code is ignored during testing. (Compl. ¶ 90.)

In total, Hertz paid Accenture over $32 million in fees and expenses during the Project. (Compl. ¶ 8.) Hertz has continued to invest resources in completing the Project and mitigating its damages. (Compl. ¶ 67.)

DISCUSSION

I.    Motion to Dismiss Standard

On a motion to dismiss, a court accepts all facts alleged in the complaint as true and construes all reasonable inferences in a plaintiff's favor. ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). Nevertheless, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted). To survive a motion to dismiss, the court must find the claim rests on factual allegations that "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." (quotation marks omitted)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

II.    Hertz's FDUTPA Claim

FDUTPA provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." Fla. Stat. § 501.204(1). "A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Virgilio v. Ryland Grp., Inc., 680 F.3d 1329, 1338 n.25 (11th Cir. 2012) (quotation marks omitted). Accenture avers that Hertz has not satisfied the first element of its FDUTPA claim, which requires a plaintiff to "show that the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." Carriuolo v. Gen. Motors Co., 823 F.3d 977,

4

983–84 (11th Cir. 2016) (quotation marks omitted). "Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably." Carriuolo, 823 F.3d at 984. "A party asserting a deceptive trade practice [therefore] need not show actual reliance on the representation or omission at issue." Davis v. Powertel, Inc., 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000).

A. Appropriate Pleading Standard

As a threshold matter, the parties disagree over the proper pleading standard applicable to FDUTPA claims. Accenture contends that FDUTPA claims sounding in fraud are governed by the heightened standards of Federal Rule of Civil Procedure 9(b). See, e.g., Segovia v. Vitamin Shoppe, Inc., 2016 WL 8650462, at *8 (S.D.N.Y. Feb. 5, 2016) ("[T]he Court will apply Rule 9(b)'s heightened pleading requirements to [the FDUTPA] claim."). Conversely, Hertz argues that Rule 9(b) is inapplicable to FDUTPA claims. See, e.g., Eli Lilly & Co. v. Tyco Integrated Sec., LLC, 2015 WL 11251732, at *2 (S.D. Fla. Feb. 10, 2015) (endorsing approach that "no claims brought under FDUTPA are subject to the heightened pleading of Rule 9(b)"); Toback v. GNC Holdings, Inc., 2013 WL 5206103, at *2 (S.D. Fla. Sept. 13, 2013) ("Rule 9(b)'s requirements are implicated by allegations of fraud, but because FDUTPA was enacted to provide remedies for conduct outside the reach of traditional common law torts like fraud, the plaintiff need not prove the elements of fraud to sustain an action under the statute." (quotation marks omitted)).

Although there is a split among Florida courts concerning the correct pleading standard for FDUTPA claims, the "prevailing view"—as Accenture correctly observes—is that Rule 9(b) applies "where the gravamen of the claim sounds in fraud." Irvine v. Kate Spade & Co., 2017 WL 4326538, at *2 (S.D.N.Y. Sept. 28, 2017) (quotation marks omitted); see also

Segovia, 2016 WL 8650462, at *8 ("Although courts in Florida have differed in their conclusions as to whether heighted pleading standards apply, the requirement of heightened pleading appears to turn on whether the FDUTPA claim sounds in fraud." (citations omitted)). Here, Rule 9(b) applies because Hertz's FDUTPA claim sounds in fraud. For example, Hertz alleges that "Accenture misrepresented the skills and expertise of its staff" and "also misrepresented the extent of [its] testing of the code." (Compl. ¶¶ 83, 90 (emphasis added).)

Rule 9(b) requires that, "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting [the] fraud . . . ." Fed. R. Civ. P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quotation marks omitted). Stated differently, the rule "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." U.S. *ex rel.* Resnick v. Weill Med. Coll. of Cornell Univ., 2010 WL 476707, at *4 (S.D.N.Y. Jan. 21, 2010) (quotation marks omitted). With that said, "it is well established that there is no bright line rule for deciding whether a complaint has satisfied Rule 9(b)." Int'l Motor Sports Grp., Inc. v. Gordon, 1999 WL 619633, at *3 (S.D.N.Y. Aug. 16, 1999) (quotation marks omitted). "Compliance with Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." U.S. *ex rel.* Kolchinsky v. Moody's Corp., 2017 WL 3841866, at *3 (S.D.N.Y. Sept. 1, 2017) (quotation marks omitted).

6

B. Alleged Misrepresentations

Accenture's alleged misrepresentations fit into two categories: (1) misstatements contained in the 2016 marketing presentation, and (2) misstatements concerning Accenture's expertise with RAPID technology and the extent of its code testing. This Court addresses both categories below.

1. The Marketing Presentation

Hertz contends that, within the 2016 marketing presentation, Accenture represented that its staff consisted of "800 [e]xperts" amounting to "[t]he best talent in the world." (Compl. ¶ 83.) The presentation also stated that Accenture had "the skills you need to win" and claimed that Accenture would "put the right team on the ground [on] day one." (Compl. ¶ 83.) Hertz avers that these statements were misleading because Accenture's personnel were not experts. On the contrary, according to Hertz, most of Accenture's developers were junior, inexperienced, and located offshore. Accenture concedes that the alleged misrepresentations in the marketing presentation are "particular" enough to satisfy the Rule 9(b) pleading standards. (Accenture LLP's Mem. of Law in Supp. of its Mot. to Dismiss the Hertz Corporation's Corr. First Am. Compl., ECF No. 30 ("MTD"), at 12.) Nonetheless, Accenture claims that these alleged misstatements are deficient because they are non-actionable puffery. (MTD, at 12.)

"Ordinarily, the question of whether a business practice . . . is deceptive, is a question of fact not appropriately resolved on a motion to dismiss." Thompson v. Procter & Gamble Co., 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018); see also State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC, 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017) ("Whether . . . conduct constitutes an unfair or deceptive trade practice is a question

of fact for the jury to determine." (quotation marks omitted)). However, courts "have recognized that some representations, referred to as 'puffery,' are not actionable as a matter of law because no reasonable person could rely upon the representations as intended conveyances of fact." Thompson, 2018 WL 5113052, at *2; see also Perret v. Wyndham Vacation Resorts, Inc., 889 F. Supp. 2d 1333, 1342 (S.D. Fla. 2012) ("[M]ost of the alleged misrepresentations [p]laintiffs rely upon are nothing more than opinion or puffery."). Here, the alleged misrepresentations are analogous to statements that courts within this circuit have routinely dismissed as non-actionable puffery, albeit in non-FDUTPA cases. See, e.g., Hamilton Exhibition, LLC v. Imagine Exhibitions, Inc., 2019 WL 2590639, at *3 (S.D.N.Y. June 11, 2019) ("Defendants' general statements that they are experts at producing exhibitions and can 'take broad concepts and translate them into concrete realities' are non-actionable statements of puffery and opinion about their expertise."); Barilli v. Sky Solar Holdings, Ltd., 389 F. Supp. 3d 232, 252 (S.D.N.Y. 2019) ("The general positive statements about [defendant's] professional history and management abilities, such as statements that he was a 'successful businessman,' are at most non-actionable puffery."); Davis v. Avvo, Inc., 345 F. Supp. 3d 534, 542 (S.D.N.Y. 2018) ("[D]efendant's . . . advertising of attorneys as 'highly qualified,' 'the right,' or the 'best' [is] nonactionable puffery" under the Lanham Act and New York General Business Law.); Gregory v. ProNAi Therapeutics Inc., 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (statements that defendant's "technology, knowledge, experience, and scientific resources provide[d] [defendant] with competitive advantages" and that defendant was "a leader in developing and . . . deliver[ing] therapeutic outcomes that dramatically changed patients' lives" were non-actionable puffery), aff'd, 757 F. App'x 35 (2d Cir. 2018) (summary order).

8

Hertz relies on two Florida cases to rebut this collection of legal authority. First, Hertz offers Thompson, where the plaintiffs alleged that the packaging for Ivory Dish Detergent was misleading under FDUTPA because it falsely stated that the soap was "trusted," "mild," and "gentle on hands." 2018 WL 5113052, at *2. These statements were "not . . . empirically verifiable," but the court nevertheless found that they could "reasonably be taken to amount to more than just a salesman's lavish claims." Thompson, 2018 WL 5113052, at *2. Second, Hertz cites Marty v. Anheuser-Busch Cos., where the court held that the statement that Beck's beer was of "German Quality" did not constitute puffery when viewed within the larger context of Beck's marketing campaign and packaging. See 43 F. Supp. 3d 1333, 1342 (S.D. Fla. 2014). These cases are readily distinguishable because they involve consumer goods—beer and dish soap—purchased by ordinary shoppers. That is, the plaintiffs in Thompson and Marty hardly resemble Hertz—a sophisticated, multi-billion-dollar company, which had a relationship with Accenture dating back to 2004. (See Compl. ¶¶ 22, 25.)

Accenture's representation that it housed "800 [e]xperts" amounting to "[t]he best talent in the world," along with its promise that it had "the skills you need to win" and would "put the right team on the ground [on] day one," are quintessential examples of puffery. Accordingly, this Court concludes that the alleged misstatements in the marketing presentation are non-actionable.

2. Misrepresentations Concerning RAPID and Code Testing

Hertz also contends that Accenture misrepresented its experience with RAPID technology and the extent of its website and mobile application code testing. (Compl. ¶¶ 89–90.) Unlike the alleged misrepresentations in the marketing presentation, Accenture avers that the

9

RAPID and coding misrepresentations do not satisfy the pleading requirements of Rule 9(b). (MTD, at 17–19.)

Hertz's claim that Accenture falsely represented its RAPID expertise does not satisfy Rule 9(b)'s heightened pleading requirements. Indeed, Hertz's claim rests on a single, vague accusation that "Accenture [falsely] led Hertz to understand that its developers had the required expertise to use RAPID properly." (Compl. ¶ 89.) This conclusory allegation cannot satisfy Rule 9(b), as the Complaint fails to explain how or when Accenture led Hertz to develop that understanding. See Rombach, 355 F.3d at 170. To be sure, the Complaint explains that Accenture recommended that Hertz utilize RAPID for the Project. (Compl. ¶ 90.) But, as Accenture notes, the mere fact that Accenture recommended RAPID to Hertz does not support Hertz's assertion that Accenture misrepresented its expertise.

Hertz's allegations concerning Accenture's code testing are likewise insufficient. The Complaint baldly asserts that "Accenture's developers . . . misrepresented the extent of their testing of the code." (Compl. ¶ 90.) Yet Hertz does not specify what Accenture represented about its code testing in the first place. Rather, Hertz—in reliance on State Farm Mutual Automobile Insurance Co.—avers that it need not provide such specifics because the "alleged fraudulent conduct occur[ed] over an extended period," thereby relaxing "the specificity requirements of Rule 9(b)." 278 F. Supp. 3d at 1321. But, even in that case, the complaint was accompanied by several supporting documents that "include[d] [the] alleged misrepresentations." State Farm Mut. Auto. Ins. Co., 278 F. Supp. 3d at 1321. Here, Hertz has offered no such support. Thus, Hertz's FDUTPA claim is dismissed with prejudice in its entirety.[1]

---

[1] Hertz participated in a pre-motion conference addressing the deficiencies in the Complaint and was afforded an opportunity to amend. Thereafter, Hertz repleaded. See DigitAlb, Sh.a v. Setplex, LLC, 284 F. Supp. 3d 547, 556–57 (S.D.N.Y. 2018) ("Courts have dismissed claims with prejudice on the basis that the plaintiff has

10

III. <u>Damages</u>

Accenture also seeks dismissal of any claim by Hertz for consequential damages, including lost profits. Accenture contends that consequential damages are straightforwardly precluded by both FDUTPA and provisions in the Consulting Services Agreement. (MTD, at 19–22.) The argument is moot as to the FDUTPA claim, which this Court dismisses with prejudice. As to the breach of contract claim, Accenture's argument is premature because Hertz has not yet specified what category of damages it will seek in this action. See, e.g., Intelligen Power Sys., LLC v. dVentus Techs. LLC, 2015 WL 3490256, at *7 (S.D.N.Y. June 2, 2015) ("Although [the contract] provision may prove to limit the damages that [plaintiff] can obtain in this lawsuit, it is premature at [the motion to dismiss] stage to determine the extent, if any, that this limitation on damages bars [plaintiff's] damages claims. Courts in this District have often determined, at the summary judgment stage, whether damages claims are general or consequential." (citations and quotation marks omitted)). Indeed, the Complaint simply states that Hertz aims to recover "the tens of millions of dollars that it paid to Accenture for the deficient services and deliverables, as well as the millions of dollars in additional costs . . . incurred in remediating and completing the Project." (Compl. ¶ 80.)

## CONCLUSION

For the foregoing reasons, Accenture's motion to dismiss is granted in part and denied in part. Hertz's FDUTPA claim is dismissed with prejudice. This Court, however, declines to determine—at least at this stage—whether the Consulting Services Agreement limits

---

already had an opportunity to replead after specific warnings as to a complaint's deficiencies." (quotation marks omitted)).

the damages available to Hertz for its breach of contract claim. The Clerk of Court is directed to terminate the motion pending at ECF No. 29.

Dated: October 25, 2019
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.