

Wiggin and Dana LLP
437 Madison Avenue
35th Floor
New York, New York 10022
www.wiggin.com

James H. Bicks
203.363.7622
212.551.2888 fax
jbicks@wiggin.com

May 8, 2020

**VIA ECF**

The Honorable William H. Pauley III
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:   <u>The Hertz Corporation v. Accenture LLP, No. 19cv3508 (WHP)</u>

Dear Judge Pauley:

Pursuant to Your Honor's Individual Rule III.A.iv Defendant/Counterclaim-Plaintiff Accenture LLP ("Accenture") and Plaintiff/Counterclaim-Defendant The Hertz Corporation ("Hertz") write jointly to address a discovery dispute that Accenture wishes to raise with the Court regarding Accenture's request that Hertz produce documents regarding the departure of twenty Hertz employees and executives who were involved with the Digital Project.

**1.      The Meet and Confer Process**

This case concerns Hertz's effort to remake its website and mobile applications, a project the parties generally referred to as the Digital C2C Project. Hertz contends that Accenture's work on the project was delayed and deficient. Accenture contends that it fully performed its obligations under the relevant contracts and that any delays or issues on the project were the result of Hertz's mismanagement and failure to deliver on the portions of the project for which Hertz was responsible. Accenture also contends that the departure from Hertz of several high-level Hertz employees and executives who were involved on the project, including Hertz's CIO, CMO, and several VPs and Directors, negatively affected the project.

In its initial discovery requests, Accenture asked Hertz to produce, for all employees involved in the project who are no longer employed by the company, "all documents related to the reasons for their departure." Ex. A, Hertz's Responses and Objections to Accenture's First Set of Requests for Production, Request No. 57 (excerpted). Hertz responded with certain objections, including overbreadth, but agreed to "work in good faith to identify and produce responsive documents." *Id*.

In reviewing Hertz's initial production of documents, Accenture was unable to locate any documents meaningfully discussing the departure from Hertz of any of its employees involved on the project. Accenture raised this issue with Hertz in November 2019. Ex. B, Letter from B. Diessel to E. Naughton at 3 (Nov. 15, 2019). In response, Hertz agreed to take reasonable efforts to "locate and produce . . . performance reviews and information concerning the circumstances of the termination of individuals involved on the Project." Ex. C, Letter from R. Lecaroz to B. Diessel at 2 (Nov. 20, 2019).

May 8, 2020
Page 2

On November 26, 2019, the Parties conducted a meet and confer to discuss the personnel documents each party would produce. During that meet and confer, Hertz "agreed to produce responsive personnel records for Hertz employees who were terminated and/or removed from the Digital Project for performance issues." Ex. D, Email from K. Dorso to J. Bicks (Nov. 26, 2019). During the November 26 meet and confer, Accenture similarly agreed, subject to client approval, to produce personnel records for Accenture employees who were rolled off the Hertz project or terminated from Accenture for performance issues during the course of the Hertz project.

Hertz completed its supplemental production of documents in February 2020. The only documents Accenture could locate in this production regarding Hertz employees were year-end evaluations prepared while these individuals were still employed at Hertz. None of the documents discussed the reasons for any of these employees' departure from the company. Hertz subsequently confirmed that these were the only documents it had produced "concerning the circumstances of the termination of individuals involved on the Digital Project." Ex. E, Email from K. Dorso to D. Roth (Mar. 3, 2020).

On March 12, Accenture again asked Hertz to produce documents regarding the departure from Hertz of key employees. Ex. F, Letter from J. Bicks to E. Naughton at 2 (Mar. 12, 2020). Accenture identified twenty individuals who have left Hertz in the last two to three years, all identified by Hertz in its initial disclosures as personnel with knowledge of the Digital Project, and asked Hertz to produce all documents regarding the circumstances of their departure from Hertz. *Id.* Accenture also asked for any severance or other post-termination agreements with these departed employees. *Id.* Hertz responded on March 13, Ex. G, Letter from E. Naughton to J. Bicks (Mar. 13, 2020), and Accenture then reiterated its request thereafter, making clear that it was asking Hertz to produce documents regarding these employees regardless of the reasons why they left the company, Ex. H, Letter from J. Bicks to E. Naughton (Mar. 17, 2020).

On March 23, Hertz produced two documents, both concerning the termination of Ryan Williams, one of the twenty employees identified in Accenture's March 12 and 17 requests.[1] On April 13, Accenture asked Hertz whether it would be producing additional documents and asked that it respond to Accenture's March 12 and 17 letters so that it could identify any dispute and raise it with the Court. Ex. I, Letter from J. Bicks to E. Naughton (Apr. 13, 2020). On April 15, Hertz responded. Ex. J, Letter from E. Naughton to J. Bicks (Apr. 15, 2020). The next day, Hertz produced two reports prepared by Deloitte in April 2018 (while Accenture was still working on the project) that, among other things, evaluated and provided recommendations to Hertz regarding the leadership of its IT department.

On April 17, Accenture asked Hertz to agree to take certain steps to locate responsive documents regarding the departure from Hertz of the twenty employees, including conducting targeted email and document searches and obtaining any relevant documents from Hertz's human resources department. Ex. K, Letter from J. Bicks to E. Naughton (Apr. 17, 2020). Accenture also once again asked Hertz to produce any severance agreements with any of the twenty employees.

The parties met and conferred on April 21. During the meet and confer, Hertz asserted that only two of the twenty employees—Greg White and Ryan Williams—were terminated from the company for cause. It contended that the remaining eighteen employees discussed in Accenture's letters left the company

---

[1] Around the same time, Hertz provided a privilege log identifying several documents regarding the termination of Greg White, another of the twenty Hertz employees identified in Accenture's letter. Hertz asserts it possesses no non-privileged documents regarding Mr. White's departure.

May 8, 2020
Page 3

voluntarily or for reasons unrelated to the Digital Project. Hertz also asserted that it had searched internally within the appropriate department for documents related to these employees' departures, and none were located. Hertz's counsel declined to enumerate the sources that Hertz's personnel had searched. Hertz directed Accenture to the publicly-available severance agreement with Tyler Best, former CIO, that had been filed with Hertz's 8-K following his resignation. Hertz otherwise refused to produce any severance agreements that may exist with any of the remaining former employees, because it contends that they are not relevant and not within the scope of the parties' prior agreement.

2.     **Accenture's Position**

An extraordinary number of Hertz personnel with key roles in the Digital Project left the company within months of one another. Hertz itself identified more than 20 such employees in its initial disclosures, including Hertz's CMO and CIO; vice presidents in Hertz's IT department; two Chief Information Security Officers who worked with Accenture; and numerous directors and other senior employees with significant involvement in the project. Accenture has been seeking discovery into the reasons for those departures for nearly a year, starting with its first requests for production served in June 2019. Such discovery is plainly relevant. Accenture's principle defense in this case will be that Hertz, through its own mismanagement, was responsible for the problems it attributes to Accenture. Evidence pertaining to the extraordinarily high turn-over in Hertz personnel with responsibilities for the Digital Project will potentially support that defense in two key respects: It will show that Hertz itself saw the need to "clean house" in recognition of the poor performance of those key personnel, and/or that those employees perceived problems at the company that prompted them to take the extraordinary measure of leaving their jobs.

Through numerous calls and rounds of correspondence, Hertz has never denied the relevance of the discovery Accenture is seeking but has instead resorted to various word games to avoid production. For instance, Hertz has limited its search to those employees "terminated for cause," and thus avoided producing documents revealing the extent to which other employees were encouraged to resign through favorable severance agreements, or reassigned; it has limited its search to "human resource files" and other "targeted" searches, and thus avoided producing emails and other communications elsewhere in the company discussing performance problems with key personnel managing the Digital Project, and the need to reduce or shift their responsibilities; and it has flat out refused to produce severance agreements, attempting to stipulate away their relevance by claiming, without permitting Accenture the opportunity to decide for itself, that "no provision in the severance agreement[s] prevents the witnesses from testifying truthfully." Hertz has used these tactics to limit its production on the critical question of why so many of its key personnel left the company to two documents relating to the termination of a single employee, Ryan Williams.

Hertz possesses far more relevant material than it has been willing to produce and should not be permitted to rely on the above tactics to continue to withhold relevant discovery. It took weeks of back and forth for Accenture to get Hertz to produce two reports, just last month, prepared by Deloitte from April 2018, which assessed Hertz's management of its IT programs, including the Digital Project.[2] In those reports, Deloitte is highly critical of Hertz's IT management, and recommends that Hertz re-evaluate the

---

[2] Those reports are responsive to several of Accenture's original discovery requests and should have been produced long ago. Instead, Hertz only produced them after Accenture served a third-party subpoena on Deloitte.

May 8, 2020
Page 4

leadership of its IT programs, including the Digital Project. Two days later, Hertz's CIO left the company. And within a month, four Hertz VPs involved in the Digital Project were gone from the company. It is inconceivable that this was a coincidence, and yet Hertz has avoided producing any of its internal communications concerning Deloitte's findings, or the status of the managers whose performance rated poorly, by drawing arbitrary lines between those personnel who were terminated for cause (as to whom Hertz says it has produced documents) and those who may have been encouraged to resign (as to whom Hertz has refused to produce documents).

Hertz's newest tactics for avoiding full document discovery are, i) to claim that such discovery is unnecessary because Accenture has been able to ask witnesses during deposition why so many key personnel left the company, and ii) to complain that it is not satisfied with Accenture's production of its own personnel files. As to the first of these rationales, Hertz ignores that its deponents have testified that they cannot speak to the reasons that their colleagues left the company, which thus highlights the need for the discovery Accenture now seeks. Ex. L, L. Rockhill Tr. at 65–69. And Hertz's complaints about Accenture's production is simple misdirection. Hertz has not made any specific demand for additional discovery from Accenture on this topic, and has not advised Accenture of any perceived "impasse" on the issue.[3] Hertz should not be permitted to distract from its own failure to produce relevant materials by manufacturing an issue that it has not properly placed before the Court.

Accenture respectfully requests that the Court direct Hertz to conduct a reasonable search of email and other electronic documents regarding the twenty employees identified by Accenture in its letter of March 12, 2020, and the circumstances of their departure from the company. Accenture also requests that the Court direct Hertz to produce severance agreements with any of these twenty individuals. Each of these individuals are potential witnesses, their post-employment relationship with Hertz is highly relevant to their bias and credibility, and these agreements may well give them obligations (such as non-disparagement) or incentives (such as incentive compensation) that affect the reliability of their testimony.

**3.      Hertz's Position**

Hertz has in good faith conducted repeated, reasonable searches for relevant and responsive documents in response to Accenture's numerous requests, even when those requests have been contrary to the parties' prior agreements. Accenture's continued insistence that Hertz must do more is not proportionate to the needs of this case, particularly in light of the volume of discovery already exchanged. Although Accenture's initial document requests asked Hertz to produce for all employees who were involved in the project but are no longer employed by the company, "all documents related to the reasons for their departure," as Accenture acknowledges, Hertz objected to this request. During the parties' November 26 meet and confer, Hertz specifically "agreed to produce responsive personnel records for Hertz employees who were terminated and/or removed from the Digital Project for performance issues," a compromise made by both parties with respect to documents relating to the departure of employees who worked on the Digital Project. Ex. D, K. Dorso email to J. Bicks (Nov. 26, 2019). Following that agreement, Hertz collected, reviewed the human resources files for all Hertz employees who had worked on the Digital Project but were no longer with Hertz, which included the files for all 20 of the individuals for whom

---

[3] Accenture's production has been more than adequate: It has produced hundreds of emails regarding employees who were removed from the project—emails Hertz itself has identified and used in depositions of Accenture's witnesses—and it has produced all documents from these employees' personnel files regarding their work on the Hertz project.

May 8, 2020
Page 5

Accenture now insists Hertz produce termination-related documents, and produced all responsive non-privileged documents.

In March, Accenture apparently decided that it was unsatisfied with the compromise the parties reached in November and demanded that Hertz produce **all** documents regarding the departure of twenty specifically identified employees (for whom Hertz had already reviewed and produced relevant documents from the employees' HR files consistent with the parties' agreement). Despite this about-face, Hertz again expended considerable effort to search for additional non-privileged documents in its possession, custody, and control that concern the departures of the employees identified by Accenture. Hertz made targeted inquiries within the company to locate additional non-privileged responsive documents, including those that fell outside of documents strictly pertaining to personnel records. As a result, Hertz identified and promptly produced two additional documents concerning the termination of Ryan Williams' employment. Accenture's claim that Hertz refused to search in good faith for these documents is wrong. Hertz has gone above and beyond its obligations and was unable to find any additional documents explaining the circumstance of their departures.

In addition to these extra efforts, during the course of discovery Hertz produced more than half a million documents collected from thirty-three agreed-upon custodians based on agreed-upon search terms. To the extent that an employee's departure impacted the Digital Project and is therefore relevant to this case, documents relating to that departure would have been captured by the documents already produced. Indeed, contrary to Accenture's assertion that Hertz has not produced any documents explaining the departure of these employees, Hertz produced multiple documents discussing the voluntary departure of Tim Delesio, one of the twenty former Hertz employees on Accenture's list.

Accenture's request that Hertz engage in an additional collection and search of an unspecified number of emails and human resource files is unreasonable and unduly burdensome. To the extent that Accenture would like additional information concerning the circumstances of certain individuals departures they can — and have — asked about this topic during depositions. Indeed, Accenture has noticed the depositions of Greg White, Tyler Best and Ray Kunik, three individuals on its list, and identified the circumstance of departure for each of these employees as a topic in their Rule 30(b)(6) notice.

Accenture's insistence that Hertz conduct further searches on this issue is particularly disingenuous given the deficiencies with Accenture's own production of documents on this topic. After the parties agreed to produce additional documents concerning the personnel records, Accenture produced only 21 documents, all of which appear to be snippets of performance reviews of Accenture employees produced in a manner that makes it very difficult, if not impossible, to connect the feedback to the applicable employee. Moreover, none of Accenture's additional documents provide an explanation as to why any of its employees were rolled off the Digital Project.  Ex. G, Letter from E. Naughton to J. Bicks (Mar. 13, 2020). Accenture seeks to justify its own deficiencies by stating that their employee files "contained little discussion of the employees' involvement in the Hertz project at all and nothing to indicate that the employee had been removed [from] the project due to his or her performance," while at the same time insisting that those documents must exist with respect to Hertz's employees, despite multiple attempts by Hertz to locate them. *See* Ex. H, Letter from J. Bicks to E. Naughton (Mar. 17, 2020) quoting D. Roth Email to K. Dorso (Feb. 10, 2020). This is a fishing expedition and a waste of time and resources.

Finally, documents regarding employees who left Hertz for reasons that were not related to their performance on the Digital Project are not relevant or proportional to the needs of the case. Accenture explicitly recognized this fact when it agreed to limit production to employees who were terminated for

performance reasons. Accenture now changes course, insisting that severance agreements are relevant to the "bias" or "credibility" of those witnesses, but that argument has little force. Accenture did not even identify most of these individuals as desired custodians when the parties were working to agree on a document collection procedure, nor have they been noticed for depositions by Accenture. Moreover, to the extent that Accenture argues that these individuals are "biased" in favor of Hertz, any such "bias" is established by the fact that they were employed by Hertz for some period of time. Hertz is willing to represent and stipulate that no provision in the severance agreement prevents the witnesses from testifying truthfully (and Hertz has not taken and will not take the position that they are so prevented), and no severance compensation the employees may have received was or is contingent on the substance of their testimony in these or any other proceedings.

\*   \*   \*   \*   \*

The parties appreciate the Court's resolution of this issue. They will make themselves available on short notice to discuss these issues with the Court, either in person or through a telephonic conference.

Respectfully submitted,

Dated: May 8, 2020

| | |
|---|---|
| By: /s/ Edward J. Naughton | /s/ James H. Bicks |
| Edward J. Naughton (*pro hac vice*) | James H. Bicks (JB2930) |
| Rebecca M. Lecaroz (*pro hac vice*) | David R. Roth (admitted pro hac vice) |
| Kyle P. Dorso (*pro hac vice*) | Wiggin and Dana LLP |
| One Financial Center | 437 Madison Avenue |
| Boston, MA 02111 | 35th Floor |
| Telephone: (617) 856-8200 | New York, New York 10022 |
| Facsimile: (617) 856-8201 | Phone: 203.363.7622 |
| enaughton@brownrudnick.com | Fax: 212.551.2888 |
| rlecaroz@brownrudnick.com | jbicks@wiggin.com |
| kdorso@brownrudnick.com | droth@wiggin.com |
| | |
| -and- | Adam M. Abensohn |
| | Manisha M. Sheth |
| D. Cameron Moxley | Jomaire A. Crawford |
| Seven Times Square | Quinn Emanuel Urquhart & Sullivan LLP |
| New York, New York 10036 | 51 Madison Avenue, 22nd Floor |
| Telephone: (212) 209-4800 | New York, NY 10010 |
| Facsimile: (212) 209-4801 | adamabensohn@quinnemanuel.com |
| cmoxley@brownrudnick.com | manishasheth@quinnemanuel.com |
| | jomairecrawford@quinnemanuel.com |
| *Counsel for Plaintiff/Counterclaim Defendant* | |
| *The Hertz Corporation* | *Counsel for Defendant/Counterclaim Plaintiff* |
| | *Accenture LLP* |